# EXHIBIT  A

**A STOCK COMPANY**



## Evanston Insurance Company

10275 West Higgins Road, Suite 750
Rosemont, IL 60018

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                                    **President**

**MJIL 1000 08 10**                                                      **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

## PRIVACY NOTICE

U. S. Consumer Privacy Notice                                                                          Rev. 1/1/2020

| FACTS | WHAT DOES MARKEL GROUP OF COMPANIES REFERENCED BELOW (INDIVIDUALLY OR COLLECTIVELY REFERRED TO AS "WE", "US", OR "OUR") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | In the course of Our business relationship with you, We collect information about you that is necessary to provide you with Our products and services. We treat this information as confidential and recognize the importance of protecting it. Federal and state law gives you the right to limit some but not all sharing of your personal information. Federal and state law also requires Us to tell you how We collect, share, and protect your personal information. Please read this notice carefully to understand what We do. |
| What? | The types of personal information We collect and share depend on the product or service you have with Us. This information can include:<br><br>• your name, mailing and email address(es), telephone number, date of birth, gender, marital or family status, identification numbers issued by government bodies or agencies (i.e.: Social Security number or FEIN, driver's license or other license number), employment, education, occupation, or assets and income from applications and other forms from you, your employer and others;<br><br>• your policy coverage, claims, premiums, and payment history from your dealings with Us, Our Affiliates, or others;<br><br>• your financial history from other insurance companies, financial organizations, or consumer reporting agencies, including but not limited to payment card numbers, bank account or other financial account numbers and account details, credit history and credit scores, assets and income and other financial information, or your medical history and records.<br><br>Personal information does not include:<br><br>• publicly-available information from government records;<br><br>• de-identified or aggregated consumer information.<br><br>When you are no longer Our customer, We continue to share your information as described in this Notice as required by law. |
| How? | All insurance companies need to share customers' personal information to run their everyday business. In the section below, We list the reasons financial companies can share their customers' personal information; the reasons We choose to share; and whether you can limit this sharing. We restrict access to your personal information to those individuals, such as Our employees and agents, who provide you with insurance products and services. We may disclose your personal information to Our Affiliates and Nonaffiliates (1) to process your transaction with Us, for instance, to determine eligibility for coverage, to process claims, or to prevent fraud, or (2) with your written authorization, or (3) otherwise as permitted by law. We do not disclose any of your personal information, as Our customer or former customer, except as described in this Notice. |

| Reasons We can share your personal information | Do We share? | Can you limit this sharing? |
|---|---|---|
| **For Our everyday business purposes and as required by law –** such as to process your transactions, maintain your account(s), respond to court orders and legal/regulatory investigations, to prevent fraud, or report to credit bureaus | Yes | No |
| **For Our marketing purposes –** to offer Our products and services to you | Yes | No |
| **For Joint Marketing with other financial companies** | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your transactions and experiences | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your creditworthiness | No | We don't share |
| **For Our Affiliates to market you** | No | We don't share |
| **For Nonaffiliates to market you** | No | We don't share |
| **Questions?** Call (888) 560-4671 or email privacy@markel.com | | |

| Who We are | |
|---|---|
| **Who is providing this Notice?** | A list of Our companies is located at the end of this Notice. |

| What We do | |
|---|---|
| **How do We protect your personal information?** | We maintain reasonable physical, electronic, and procedural safeguards to protect your personal information and to comply with applicable regulatory standards. For more information, visit www.markel.com/privacy-policy. |
| **How do We collect your personal information?** | We collect your personal information, for example, when you <br> • complete an application or other form for insurance <br> • perform transactions with Us, Our Affiliates, or others <br> • file an insurance claim or provide account information <br> • use your credit or debit card <br> We also collect your personal information from others, such as consumer reporting agencies that provide Us with information such as credit information, driving records, and claim histories. |
| **Why can't you limit all sharing of your personal information?** | Federal law gives you the right to limit only <br> • sharing for Affiliates' everyday business purposes – information about your creditworthiness <br> • Affiliates from using your information to market to you <br> • sharing for Nonaffiliates to market to you <br> State laws and individual companies may give you additional rights to limit sharing. See the Other Important Information section of this Notice for more on your rights under state law. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>• Our Affiliates include member companies of Markel Group. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• Nonaffiliates that We can share with can include financial services companies such as insurance agencies or brokers, claims adjusters, reinsurers, and auditors, state insurance officials, law enforcement, and others as permitted by law. |
| **Joint Marketing** | A formal agreement between Nonaffiliated companies that together market financial products or services to you.<br>• Our Joint Marketing providers can include entities providing a service or product that could allow Us to provide a broader selection of insurance products to you. |

| Other Important Information |
|---|
| **For Residents of AZ, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, and VA:** Under state law, under certain circumstances you have the right to access and request correction, amendment or deletion of personal information that We have collected from or about You. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060.<br><br>We may charge a reasonable fee to cover the costs of providing this information. We will let you know what actions We take. If you do not agree with Our actions, you may send Us a statement. |
| **For Residents of CA:** You have the right to review, make corrections, or delete your recorded personal information contained in Our files. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. We do not and will not sell your personal information.<br><br>For the categories of personal information We have collected from consumers within the last 12 months, please visit: www.markel.com/privacy-policy. |
| **For Residents of MA and ME:** You may ask, in writing, for specific reason, for an adverse underwriting decision. |
| **Markel Group of Companies Providing This Notice:** City National Insurance Company, Essentia Insurance Company, Evanston Insurance Company, FirstComp Insurance Company, Independent Specialty Insurance Company, National Specialty Insurance Company, Markel Bermuda Limited, Markel American Insurance Company, Markel Global Reinsurance Company, Markel Insurance Company, Markel International Insurance Company Limited, Markel Service, Incorporated, Markel West, Inc. (d/b/a in CA as Markel West Insurance Services), Pinnacle National Insurance Company, State National Insurance Company, Inc., Superior Specialty Insurance Company, SureTec Agency Services, Inc. (d/b/a in CA as SureTec Agency Insurance Services), SureTec Indemnity Company, SureTec Insurance Company, United Specialty Insurance Company, Inc. |



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, 10275 West Higgins Road, Suite 750, Rosemont, Illinois 60018, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

INTERLINE



# Evanston Insurance Company

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – https://www.treasury.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



# EVANSTON INSURANCE COMPANY

# COMMON POLICY DECLARATIONS

POLICY NUMBER:  TBL1643-B02                    RENEWAL OF POLICY:  TBL1643-B01

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)

PGT Trucking Inc dba PGT Freight Brokerage

4200 Industrial Blvd

Aliquippa, PA 15001

Policy Period: From 06/30/2020 to 06/30/2021 at 12:01 A.M. Standard Time at your mailing address shown above.

BUSINESS DESCRIPTION: Truck Broker

| FORM OF BUSINESS | | | | |
|---|---|---|---|---|
| ☐ Individual | ☐ Partnership | ☐ Joint Venture | ☐ Trust | ☑ Corporation |
| ☐ Limited Liability Company | ☐ Other Organization: | | | |

Audit Period: Annual unless otherwise stated:                    FTZ Code:

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PART(S), BUT ONLY FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT. | |
|---|---|
| Commercial Property Coverage Part | $ |
| Commercial General Liability Coverage Part | $ |
| Commercial Inland Marine Coverage Part | $ |
| Commercial Ocean Marine Coverage Part | $ |
| Commercial Professional Liability Coverage Part | $ |
| Commercial Automobile Liability Coverage Part | $ ███████ |
| Liquor Liability Coverage Part | $ |
| Crime Coverage Part | $ |
| Other Coverage: | $ |
| | $ |
| **Premium Total** | $ ███████ |
| Other Charges:  Policy Fee | $ ███████ |
| Surplus Lines Tax | $ ███████ |
| Stamping Fee | ███████ |
| | $ |
| **GRAND TOTAL** | $ ███████ |

## Producer Number, Name and Mailing Address

Greenwich Transportation Underwriters, Inc.

6 Cadillac Drive

Suite 410

Brentwood, TN 37027

Inspection Ordered: No

Program Code:

| ENDORSEMENTS |
|---|
| Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue: |
| SEE FORMS SCHEDULE – MDIL 1001 |

**These declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.**

Countersigned: _____6/19/2020_____    By: _____
                          Date                                    AUTHORIZED REPRESENTATIVE

"The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation. This insurance is NOT covered by the Pennsylvania Insurance Guaranty Association."

PA Licensee:  Benjamin Armistead #303886

**POLICY NUMBER: TBL1643-B02**

**MARKEL®**

# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

Interline:
MJIL 1000 (08 10) - Policy Jacket
MPIL 1007 (01 20) - Privacy Notice
MEIL 1200 (02 20) - Service of Suit
MPIL 1083 (04 15) - US Treasury Department's OFAC Advisory Notice to Policyholders
MDIL 1000 (08 11) - Common Policy Declarations
MDIL 1001 (08 11) - Forms Schedule
IL 00 17 (11 98) - Common Policy Conditions
IL 00 21 (09 08) - Nuclear Energy Liability Exclusion
MEIL 1225 (10 11) - Changes - Civil Union
MIL 1214 (09 17) - Trade or Economic Sanctions
MPTB 2000 (05 13) - Transportation Broker Liability and Contingent Auto Claim Procedure
METB 2202 (05 13) - Two or More Coverage Forms Issued By Us
IL 02 46 09 07 - Pennsylvania Changes - Cancellation And Nonrenewal
IL 09 10 07 02 - Pennsylvania Notice
Truck Broker Liability:
MDTB 2000 (05 13) - Transportation Broker Liability and Contingent Auto Declarations
METB 0001 (10 17) - Transportation Broker Liability and Contingent Auto Coverage Form
METB 2305 (08 16) - Exclusion - Insured versus Insured

**MDIL 1001 08 11**

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

A. **Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

B. **Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

C. **Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

D. **Inspections And Surveys**

1. We have the right to:

    a. Make inspections and surveys at any time;

    b. Give you reports on the conditions we find; and

    c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

    a. Are safe or healthful; or

    b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

E. **Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

F. **Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

 Copyright, Insurance Services Office, Inc., 1998 □

IL 00 21 09 08

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

© ISO Properties, Inc., 2007

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

  (a)  Any "nuclear reactor";

  (b)  Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

  (c)  Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

  (d)  Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2007

INTERLINE



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES – CIVIL UNION

All references to "spouse" or "family member" in any Coverage Part or policy form made part of this insurance shall include a party to a civil union or domestic partnership law recognized under any applicable statute.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

 **MARKEL**®

EVANSTON INSURANCE COMPANY

## TRANSPORTATION BROKER LIABILITY AND CONTINGENT AUTO
## CLAIM PROCEDURE

Please immediately report a new claim under this policy to:

newclaims@markelcorp.com

For general claims inquiries after a claim has been reported, please email:

markelclaims@markelcorp.com

In order for us to expedite the handling of your claim and quickly refer it to the appropriate party, please have the following information available:

- Claim number (or report as new)
- Your name, contact information and position with the Named Insured
- Date of loss
- Policy number or insured name
- Type of loss - bodily injury, property damage, covered pollution cost or expense
- Name, address, telephone number and MC # of the motor carrier to whom the load is brokered
- Length of time insured has done business with the motor carrier involved in the loss
- Details of loss

Please also include a copy of the broker/carrier agreement signed by the insured and the motor carrier.

Our address and contact information is as follows:

Markel Claims
P.O. Box 2009
Glen Allen, VA 23058-2009
PH:  800-3 MARKEL (800-362-7535)
FX:  855-6 MARKEL (855-662-7535)

Markel understands the importance of having knowledgeable claims professionals prepared to answer your questions with personal attention and expertise. With over 225 associates across four times zones, you are sure to find the claims assistance you need --when you need it.

INTERLINE



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TWO OR MORE COVERAGE FORMS OR POLICIES ISSUED BY US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
CONTINGENT CARGO COVERAGE FORM
TRANSPORTATION BROKER LIABILITY AND CONTINGENT AUTO COVERAGE FORM

The following condition is added:

**Multiple Coverage Forms Or Policies Issued By Us**

When two or more Coverage Forms or policies issued by us or any other Markel Corporation owned or operated insurance company apply to the same claim, "suit", or loss, the maximum limit of our liability under all such Coverage Forms or policies combined shall not exceed the highest applicable limit of liability under any one Coverage Form or policies among them.

All other terms and conditions remain unchanged.

**METB 2202 05 13**       Includes copyrighted material of Insurance Services Office, Inc. with its permission.       **Page 1 of 1**

IL 02 46 09 07

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# PENNSYLVANIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

> CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
> COMMERCIAL AUTOMOBILE COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> CRIME AND FIDELITY COVERAGE PART
> EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
> EQUIPMENT BREAKDOWN COVERAGE PART
> FARM COVERAGE PART
> FARM UMBRELLA LIABILITY POLICY
> LIQUOR LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. The Cancellation Common Policy Condition is replaced by the following:

CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

2. Cancellation Of Policies In Effect For Less Than 60 Days

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

3. Cancellation Of Policies In Effect For 60 Days Or More

   If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

   a. You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

   b. You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

   c. A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

   d. Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

© ISO Properties, Inc., 2006

e. Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

f. Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

4. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

5. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

6. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

7. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

B. The following are added and supersede any provisions to the contrary:

1. Nonrenewal

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

2. Increase Of Premium

If we increase your renewal premium, we will mail or deliver to the first Named Insured written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to the first Named Insured's last known address. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

© ISO Properties, Inc., 2006

IL 02 46 09 07    ◻

IL 09 10 07 02

# PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

1. Surveys;

2. Consultation or advice; or

3. Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

1. If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;

2. To consultation services required to be performed under a written service contract not related to a policy of insurance; or

3. If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

---

**Instruction to Policy Writers**

Attach the Pennsylvania Notice to all new and renewal certificates insuring risks located in Pennsylvania.

---



# EVANSTON INSURANCE COMPANY

## TRANSPORTATION BROKER LIABILITY AND CONTINGENT AUTO DECLARATIONS

POLICY NUMBER:  TBL1643-B02

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLCY.**

**COVERAGE SCHEDULE**

| Limit Of Insurance: | |
|---|---|
| Each Accident: | $1,000,000 Combined Single Limit |

**PREMIUM COMPUTATION**

| Estimated Exposure | Exposure Basis | Rate |
|---|---|---|
| $30,000,000 | Per $1,000 Gross Transportation Broker Receipts | $0.78 |

When Gross Transportation Broker Receipts is used as the Rating Basis.  Gross Transportation Broker Receipts means the total amount to which you are entitled for brokering the shipping or transporting property during the policy period.

**PREMIUM**

| Total Advanced Premium | Minimum Annual Premium | Minimum Earned |
|---|---|---|
| $23,500 | $23,500 | $5,875.00 |

**PREMIUM AUDIT**

| Audit Period:  **ANNUAL** |
|---|

**ENDORSEMENTS ATTACHED TO THIS POLICY**

| Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue: |
|---|
| SEE FORMS SCHEDULE -- MDIL 1001 |

**These Declarations, together with the Common Policy Conditions, Coverage Forms and any Endorsements complete the above numbered policy.**

**MDTB 2000 05 13**



# EVANSTON INSURANCE COMPANY

## TRANSPORTATION BROKER LIABILITY AND CONTINGENT AUTO COVERAGE FORM

**VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.**

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

**SECTION I – LIABILITY COVERAGE**

**A. Insuring Agreement**

   **1.** We will pay those sums an insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage", and applicable "covered pollution cost or expense", to which this insurance applies, caused by an "accident":

   **a.** Resulting from a "motor carrier's" ownership, maintenance or use, including loading and unloading, of a "motor carrier's auto"; or

   **b.** Arising out of the negligent hiring of or entrustment to the "motor carrier" by the insured in the insured's operations as a "transportation broker".

   However, we will only pay for "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

   **2.** We have the right and duty to defend any insured against a "suit" asking for such damages. However, we have no duty to defend any insured against a "suit" seeking damages to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the limit of insurance has been exhausted by payment of judgments or settlements.

**B. Supplementary Payments**

   We will pay for the insured:

   **1.** All expenses we incur.

   **2.** Up to $2,000 for the cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

   **3.** The cost of bonds to release attachments in any "suit" against the insured we defend, but only for bond amounts within our limit of insurance.

   **4.** All reasonable expenses incurred by the insured at our request, including actual loss of earnings up to $250 a day because of time off from work.

   **5.** All costs taxed against the insured in any "suit" against the insured we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   **6.** All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" against the insured we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our limit of insurance.

These payments will not reduce the limit of insurance.

## C. Exclusions

This insurance does not apply to:

**1. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.

**2. Contractual**

Liability assumed under any contract or agreement. But this exclusion does not apply to liability for damages that the insured would have in the absence of such contract or agreement.

**3. Workers' Compensation**

Any obligation for which the insured or the insured's insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

**4. Employee Indemnification And Employer's Liability**

  **a.** "Bodily injury" to an "employee" of the insured arising out of and in the course of:

    **(1)** Employment by the insured; or

    **(2)** Performing the duties related to the conduct of the insured's business; or

  **b.** "Bodily injury" to the spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **a.** above.

This exclusion applies:

    **(1)** Whether the insured may be liable as an employer or in any other capacity; and

    **(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**5. Fellow Employee**

"Bodily injury" to any fellow "employee" of the insured arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business as a "transportation broker".

**6. Care, Custody Or Control**

"Property damage" to or "covered pollution cost or expense" involving property in the care, custody or control of a "motor carrier" for whom the insured is liable as a "transportation broker".

**7. Mobile Equipment**

"Bodily injury" or "property damage" arising out of the operation of "mobile equipment".

However, this exclusion does not apply to the transport of "mobile equipment" in or upon a "motor carrier's auto" involved in an "accident" for which coverage is provided under this Coverage Form.

**8. Pollution**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

  **a.** That are, or that are contained in any property that is:

    **(1)** Being transported or towed by, handled, or handled for movement into, onto or from, the "motor carrier's auto";

    **(2)** Otherwise in the course of transit on behalf of the insured; or

    **(3)** Being stored, disposed of, treated or processed in or upon the "motor carrier's auto";

  **b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted on behalf of the insured for movement into or onto the "motor carrier's auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the "motor carrier's auto" to the place where they are finally delivered, disposed of or abandoned on behalf of the insured.

Paragraph **a.** of this exclusion does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the "motor carrier's auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury" or "property damage" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to a party for which the insured is liable as a "transportation broker", with respect to "pollutants" not in or upon a "motor carrier's auto" if:

**(1)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of the "motor carrier's auto"; and

**(2)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**9. War**

"Bodily injury" or "property damage" arising directly or indirectly out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**10 Racing**

"Autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that "auto" is being prepared for such a contest or activity.

**11. No Fault, Uninsured Motorists, Personal Injury Protection**

Any liability arising out of any claims brought under no fault, uninsured and/or underinsured motorists, financial responsibility or personal injury protection laws, statutes or similar legislation.

**12. Motor Carrier Operations**

"Bodily injury" or "property damage" arising directly or indirectly out of an "accident" when the insured, a spouse or family member of the insured, an "employee" of the insured, or any entity in which the insured has partial or full ownership, is acting as the "motor carrier" or is listed on the bill of lading or contract of carriage.

**13 Other Operations**

Any operations by or on behalf of the insured other than operations as a "transportation broker".

**14. Professional Services**

Any errors, omissions or professional services, other than services provided as a "transportation broker", resulting in "bodily injury" or "property damage".

## SECTION II – WHO IS AN INSURED

**A.** If you are designated in the Declarations as:

**1.** An individual, you and your spouse are insureds, but only with respect to the conduct of your business as a "transportation broker" of which you are the sole owner.

**2.** A partnership or joint venture, you and your members, partners and their spouses are insureds, but only with respect to the conduct of your business as a "transportation broker".

3. A limited liability company, you and your members are insureds, but only with respect to the conduct of your business as a "transportation broker". Your managers are insureds, but only with respect to their duties as your managers.

4. An organization other than a partnership, joint venture or limited liability company, you are an insured, but only with respect to the conduct of your business as a "transportation broker". Your executive officers and directors are insureds, but only with respect to their duties as your executive officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

5. A trust, you and your trustees are insureds, but only with respect to the conduct of your business as a "transportation broker".

**B.** The following are also insureds:

1. Your "employees", but only for acts within the scope of their employment and with respect to the conduct of your business as a "transportation broker".

2. Your independent contractors, but only for acts within the scope of the "agent/broker agreement" and with respect to the conduct of your business as a "transportation broker".

## SECTION III – LIMITS OF INSURANCE

**A.** The Limits Of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

1. Insureds;

2. "Motor carrier's autos";

3. Claims made or "suits" brought; or

4. Persons or organizations making claims or bringing "suits".

**B.** The most we will pay for the total of all damages resulting from any one "accident" is the Each Accident Combined Single Limit shown in the Declarations.

**C.** All "bodily injury", "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

## SECTION IV – CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

**A. Loss Conditions**

**1. Duties In The Event Of Accident, Claim, Suit Or Loss**

We have no duty to provide coverage under this Coverage Form unless there has been full compliance with the following duties:

**a.** In the event of an "accident", claim, "suit" or loss, you must give us or our authorized representative prompt notice of the "accident" or loss. Include:

**(1)** How, when and where the "accident" or loss occurred;

**(2)** The insured's name and address;

**(3)** To the extent possible, the names and addresses of any injured persons and witnesses;

**(4)** A copy of the "broker/carrier agreement";

**(5)** The contact name and telephone number of the "motor carrier" involved in the loss; and

**(6)** Length of time the insured has done business with the "motor carrier" involved in the loss.

**b.** Additionally, you and any other involved insured must:

**(1)** Assume no obligation, make no payment or incur no expense without our consent.

**(2)** Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit".

**2. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form until:

**a.** There has been full compliance with all the terms of this Coverage Form; and

**b.** We agree in writing that the insured has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this Coverage Form to bring us into an action to determine the insured's liability.

**3. Separation of Insureds**

Except with respect to the limit of insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

**4. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Form, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**B. General Conditions**

**1. Arbitration**

If we and the insured do not agree whether coverage is provided under this Coverage Form for a claim made against the insured, then either party may make a written demand for arbitration.

When this demand is made, each party will select an arbitrator. The two arbitrators will select a competent and impartial arbitrator. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction. Each party will:

**a.** Pay the expenses it incurs; and

**b.** Bear the expenses of the third arbitrator equally.

Unless both parties agree otherwise, arbitration will take place in the county or parish in which the address shown in the Declarations is located. Local rules of law as to procedure and evidence will apply. A decision agreed to by two of the arbitrators will be binding.

**2. Bankruptcy**

Bankruptcy or insolvency of the insured or the insured's estate will not relieve us of any obligation under this Coverage Form.

**3. Concealment, Misrepresentation Or Fraud**

This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**a.** This Coverage Form;

**b.** A claim under this Coverage Form.

**4. Liberalization**

If we revise this Coverage Form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state or locality.

**5. Other Insurance**

The insurance provided by this Coverage Form is excess over any other insurance, whether primary, excess, contingent or any other basis, unless such other insurance is written to be specifically excess over this policy.

When this Coverage Form and any other coverage form or policy covers on the same basis, we will pay only our share. Our share is the proportion that the limit of insurance of our Coverage Form bears to the total limits of all the coverage forms and policies covering on the same basis.

If any other insurance does not permit contribution by limits, we will contribute by equal shares. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

6. **Premium Audit**

   a. We will compute all premiums for this Coverage Form in accordance with our rules and rates.

   b. If the premium for this Coverage Form is a flat premium, it is not subject to adjustment.

   The Premium shown in the Declarations as the Advance Premium is a deposit premium only. If the Coverage Form is subject to audit adjustment, the actual exposure base will be used to compute the earned premium. If the earned premium is greater than the Advance Premium, the first Named Insured will pay the difference to us due and payable upon notice.

   Subject to the Annual Minimum Premium and Minimum Earned Premium at Inception shown in the Declarations, if the earned premium is less than the Advance Premium, we will return the difference to the first Named Insured.

   c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request. The first Named Insured shown on the Declarations is responsible for the payment of all premiums and will be the payee for any return premiums we pay.

7. **Policy Period And Coverage Territory**

   Under this Coverage Form, we cover "accidents" occurring:

   a. During the policy period shown in the Declarations; and

   b. Within the coverage territory of this Coverage Form.

   The coverage territory is anywhere in the world provided the insured's responsibility to pay damages is determined in a "suit" on the merits in the United States of America (including its territories and possessions), Puerto Rico and Canada.

   Notwithstanding the foregoing, payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC).

8. **Representation**

   By accepting this policy you agree:

   a. The statements in the Declarations are accurate and complete;

   b. Those statements are based upon representations made in the application; and

   c. We have issued this policy in reliance upon your representations.

## SECTION V – DEFINITIONS

A. "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

B. "Agent/broker agreement" means a written contract executed prior to an "accident", between a "transportation broker" and an independent contractor, the terms of which define the conditions under which the independent contractor will act as an agent of the "transportation broker".

C. "Auto" means:

   1. A land motor vehicle or "trailer" designed for travel on public roads; or

   2. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

   However, "auto" does not include "mobile equipment".

D. "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

E. "Broker/carrier agreement" means a written contract, executed prior to an "accident", between a "transportation broker" and a "motor carrier", the terms of which define the conditions under which the "motor carrier" will provide transportation services pursuant to its federal authority.

F. "Covered pollution cost or expense" means any cost or expense arising out of:

**1.** Any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**2.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

    **a.** That are, or that are contained in any property that is:

        **(1)** Being transported or towed by, handled or handled for movement into, onto or from the "motor carrier's auto";

        **(2)** Otherwise in the course of transit by or on behalf of the insured; or

        **(3)** Being stored, disposed of, treated or processed in or upon the "motor carrier's auto";

    **b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the insured for movement into or onto the "motor carrier's auto"; or

    **c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the "motor carrier's auto" to the place where they are finally delivered, disposed of or abandoned by the insured.

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the "motor carrier's auto" or its parts, if:

    **(1)** The "pollutants" escape, seep, migrate or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

    **(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraph **6.b.** or **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above do not apply to "accidents" that occur away from premises owned by or rented to an insured with respect to "pollutants" not in or upon a "motor carrier's auto" if:

    **(1)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a "motor carrier's auto"; and

    **(2)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**G.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**H.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**I.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    **1.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    **2.** Vehicles maintained for use solely on or next to premises you own or rent;

    **3.** Vehicles that travel on crawler treads;

    **4.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        **a.** Power cranes, shovels, loaders, diggers or drills; or

        **b.** Road construction or resurfacing equipment such as graders, scrapers or rollers.

    **5.** Vehicles not described in Paragraph **1.**, **2.**, **3.**, or **4.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        **a.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    **b.**  Cherry pickers and similar devices used to raise or lower workers.

**6.**  Vehicles not described in Paragraph **1.**, **2.**, **3.**, or **4.** above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

    **a.**  Equipment designed primarily for:

        **(1)**  Snow removal;

        **(2)**  Road maintenance, but not construction or resurfacing; or

        **(3)**  Street cleaning;

    **b.**  Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    **c.**  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**J.**  "Motor carrier" means any person or organization, authorized by the Federal Motor Carrier Safety Administration or the state in which he or she operates, to act in the business of transporting property by "auto" for hire.

**K.**  "Motor carrier's auto" means an "auto" owned, leased or operated by the "motor carrier" with whom the insured has entered into a "broker/carrier agreement". A "motor carrier's auto" is considered a non-owned or hired "auto" by the insured.

"Motor carrier's auto" does not mean an "auto" that is owned, leased or operated by any:

  **1.**  Insured;

  **2.**  Spouse or family member of any insured;

  **3.**  "Employee" of an insured; or

  **4.**  Individual or entity that shares common ownership of any "auto" with any insured.

**L.**  "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**M.**  "Property damage" means damage to or loss of use of tangible property.

**N.**  "Suit" means a civil proceeding in which:

  **1.**  Damages because of "bodily injury", or "property damage"; or

  **2.**  A "covered pollution cost or expense";

to which this insurance applies, are alleged.

"Suit" includes:

    **a.**  An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    **b.**  Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**O.**  "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**P.**  "Trailer" includes a semitrailer or a dolly used to convert a semitrailer into a trailer.

**Q.**  "Transportation broker" means a person, not acting in the capacity of a "motor carrier", who is authorized by the Federal Motor Carrier Safety Administration as a Freight Broker and who, for compensation, arranges, or offers to arrange, the transportation of property by a "motor carrier" pursuant to a "broker/carrier agreement".

COMMERCIAL AUTO



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – INSURED VERSUS INSURED

This endorsement modifies insurance provided under the following:

TRANSPORTATION BROKER LIABILITY AND CONTINGENT AUTO COVERAGE FORM

The following exclusion is added to Paragraph **C.** Exclusions under Section **I** – Liability Coverage:

This insurance does not apply to:

**Insured Versus Insured**

Any claim or "suit" alleging "bodily injury" or "property damage" made or brought by any insured covered by this policy against any other insured covered by this policy.

All other terms and conditions remain unchanged.

# EXHIBIT  B

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

**IN THE CIRCUIT COURT OF THE COUNTY OF CAPE GIRARDEAU**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| LORA B. SCHUMER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| J VANWINKLE TRUCKING LLC; | ) | Case No. 22CG-CC00195 |
| KEATON R WATSON; | ) | |
| PGT TRUCKING, INC.; | ) | In Excess of $25,000 |
| NUCOR CORP., d/b/a NUCOR STEEL; | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| HEIDTMAN STEEL PRODUCTS, INC.; | ) | |
| Serve: | ) | |
|     Kathleen Ann Uram | ) | |
|     10 Northgate Industrial Drive | ) | |
|     Granite City, IL 62040-6805 | ) | |
| | ) | |
| STANLEY BLACK & DECKER, INC f/k/a | ) | |
| WATERLOO INDUSTRIES, INC.; and | ) | |
| Serve: | ) | |
|     Illinois Corporation Service Company | ) | |
|     801 Adlai Stevenson Drive | ) | |
|     Springfield, IL 62703-4261 | ) | |
| | ) | |
| KINDER MORGAN BULK TERMINALS LLC | ) | |
| Serve: | ) | |
|     Capitol Corporate Services, Inc. | ) | |
|     300 S. Spring St, Ste 900 | ) | |
|     Little Rock, AR 72201 | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED PETITION FOR DAMAGES**

COMES NOW Plaintiff, Lora B. Schumer, by and through her attorneys of record, and

for her causes of action against the Defendants named in this Second Amended Petition for

Damages, hereby states and alleges as follows:

**GENERAL ALLEGATIONS**

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

1.      At all times relevant herein, Plaintiff, Lora B. Schumer, (hereinafter "Plaintiff") is and was a resident of Jackson, County of Cape Girardeau and a citizen of Missouri.

2.      At all times relevant herein, Defendant Nucor Corporation d/b/a Nucor Steel (hereinafter "Defendant Nucor"), is and was a foreign corporation incorporated in Delaware and engaged in the business of manufacturing, selling, and shipping products, including steel coils, throughout the country via interstate commerce.

3.      On some date prior to June 1, 2021, Defendant Nucor melted and manufactured two steel coils with a combined weight in excess of 43,000 pounds (hereinafter "the steel coils").

4.      At all times relevant herein, Defendant Kinder Morgan Bulk Terminals LLC (hereinafter "Defendant Kinder Morgan"), is and was a foreign LLC created in Louisiana and engaged in the business of storing and distributing property, including steel coils, throughout the country via interstate commerce.

5.      On some date prior to June 1, 2021, Defendant Nucor hired Defendant Kinder Morgan to receive and store the steel coils in Blytheville, Arkansas until the time the steel coils were purchased.

6.      On some date prior to June 1, 2021, Defendant Kinder Morgan received, from Defendant Nucor, and stored the steel coils at Defendant Kinder Morgan's Blytheville, Arkansas location.

7.      At all times relevant herein, Defendant Heidtman Steel Products, Inc. (hereinafter "Defendant Heidtman Steel"), is and was a foreign corporation incorporated in Ohio and doing business nationwide.

8.      On some date prior to June 1, 2021, Defendant Heidtman Steel purchased the steel coils with the intent of distributing the steel coils.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

9.      At all times relevant herein, Defendant Stanley Black & Decker, Inc. f/k/a Waterloo Industries, Inc. (hereinafter "Defendant Black & Decker"), is and was a foreign corporation incorporated in Connecticut and doing business nationwide.

10.      On some date prior to June 1, 2021, Defendant Black & Decker contracted with Defendant Nucor and/or Defendant Heidtman Steel for the purchased steel coils to be delivered to Defendant Black & Decker's Sedalia, Missouri location.

11.      At all times relevant herein, Defendant PGT Trucking, Inc. (hereinafter "Defendant PGT Trucking"), is and was a foreign company incorporated in Pennsylvania and operating as an interstate, for-hire commercial motor carrier, USDOT #192897.

12.      On some date prior to June 1, 2021, Defendant Nucor entered into a Master Agreement with Defendant PGT Trucking which provided that PGT Trucking, as a motor carrier, would transport steel and steel products on behalf of Defendant Nucor.

13.      Pursuant to the Master Agreement referenced in Para. #12, Defendant PGT Trucking was to transport, or arrange for the transport, of the steel coils from Defendant Kinder Morgan's Blytheville, Arkansas location to Sedalia, Missouri.

14.      At all times relevant herein, Defendant J VanWinkle Trucking, LLC (hereinafter "Defendant VanWinkle"), is and was a domestic company organized under the laws of Missouri and was operating as an interstate, for-hire commercial motor carrier, USDOT #2927425.

15.      On some date prior to June 1, 2021, Defendant PGT Trucking hired Defendant VanWinkle to serve as the "End Carrier" and transport the steel coils.

16.      At all times relevant herein, Defendant Keaton R. Watson (hereinafter "Defendant Watson"), is and was a resident of Winona, County of Shannon and a citizen of Missouri.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

17.    At all times relevant herein, Defendant Watson was the actual agent/employee of Defendant VanWinkle.

18.    At all times relevant herein, Defendant VanWinkle was acting individually and through its drivers, agents, servants, and/or employees, including Defendant Watson, each of whom were acting within the course and scope of their employment with Defendant VanWinkle.

19.    The Shipping Order/Bill of Lading #1194074 related to the transport of the steel coils designates Defendant PGT Trucking as the "carrier".

20.    At all times relevant herein, Defendant Watson was the apparent agent/employee of Defendant PGT Trucking.

21.    At all times relevant herein, Defendant Watson was operating a 2004 Peterbilt tractor-trailer (hereinafter "the tractor-trailer") in the course and scope of his employment with Defendant VanWinkle and Defendant PGT Trucking.

22.    At all times relevant herein, Defendant VanWinkle owned, leased, controlled, and/or operated the tractor-trailer that was involved in this crash.

23.    In addition to acting as a carrier, at all times relevant herein, Defendant PGT Trucking was also acting as an agent for the shipper(s) involved herein and/or was subject to the retained control of said shipper(s).

24.    In its relevant parts, the Federal Motor Carrier Safety Regulations define "Motor Carrier" as a for-hire motor carrier or a private motor carrier; including a motor carrier's agents, officers and representatives, as well as employees responsible for hiring, supervising, training, assigning, or dispatching of drivers and employees concerned with the installation, inspection, and maintenance of motor vehicle equipment and/or accessories; this definition includes the term "employer." 49 C.F.R. §390.5.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

25.     At all times relevant herein, Defendant VanWinkle and Defendant PGT Trucking were "Motor Carriers" as that term is defined by the Federal Motor Carrier Safety Regulations.

26.     In its relevant parts, the Motor Carrier Safety Regulations define "Motor Vehicle" as any vehicle, machine, tractor, trailer, or semi-trailer propelled or drawn by mechanical power and used upon the highways in the transportation of passengers or property, or any combination thereof determined by the Federal Motor Carrier Safety Administration.  49 C.F.R. §390.5.

27.     At all times relevant to this case, the tractor-trailer driven by Defendant Watson was a "Motor Vehicle," as defined by the Motor Carrier Safety Regulations.

28.     In its relevant parts, the Motor Carrier Safety Regulations define an "Employee" as any individual, other than an employer, who is employed by an employer and who, in the course of his or her employment directly, affects commercial motor vehicle safety.  "Employee" includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle).  49 C.F.R. §390.5.

29.     At all times relevant herein, Defendant Watson was a driver of the tractor-trailer, a commercial motor vehicle, and therefore, was an "Employee," as defined by the Motor Carrier Safety Regulations.

30.     At all times relevant herein, Defendant VanWinkle and Defendant PGT Trucking were subject to and required to abide by the rules and regulations contained and set forth in Title 49, Code of Federal Regulations (Federal Motor Carrier Safety Regulations) and RSMo. 307.400 while operating as interstate commercial motor carriers.

31.     At all times relevant herein, Defendant Watson, was subject to and required to abide by the rules and regulations contained and set forth in Title 49, Code of Federal Regulations (Federal Motor Carrier Safety Regulations) and RSMo. 307.400 while operating a

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

commercial motor vehicle.

32.　At all times relevant herein, Interstate 55 in the County of Cape Girardeau, State of Missouri, is and was an open and public roadway.

33.　At all times relevant herein, Defendant VanWinkle's name, DOT number and MC number were displayed on the tractor-trailer being driven by Defendant Watson.

34.　On June 1, 2021, Plaintiff was operating her vehicle traveling northbound on Missouri Interstate 55.

35.　On June 1, 2021, Defendant Watson was operating his commercial motor vehicle traveling northbound on Missouri Interstate 55.

36.　At said time and place, Defendant Watson operated his commercial motor vehicle in a manner that was dangerous given that traffic was stopped ahead in the northbound traveling lane on Missouri Interstate 55.

37.　At said time and place, Defendant Watson noticed the traffic in front of him was stopped and as a result, abruptly swerved the tractor-trailer into the center median in an attempt to avoid making contact with other vehicles.

38.　At said time and place, Defendant Watson's actions or nonactions caused the tractor-trailer to strike another vehicle(s).

39.　At said time and place, the steel coils on the flatbed of the tractor-trailer operated by Defendant Watson came off of the trailer and landed on Interstate 55.

40.　At said time and place, one of the steel coils struck Plaintiff's vehicle as Plaintiff's vehicle was stopped on Interstate 55.

41.　Plaintiff was in no way negligent in the operation of her vehicle at the time of the crash.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

## COUNT I
## NEGLIGENCE OF DEFENDANT KEATON R. WATSON

**COMES NOW** Plaintiff Lora Schumer, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant Keaton R. Watson and further states:

42.     At all times relevant herein, Defendant Watson was required to obey the Federal Motor Carrier Safety Regulations and safe trucking industry standards while securing cargo to the tractor-trailer and while operating a commercial motor vehicle.

43.     At all times relevant herein, Defendant Watson was required to obey Missouri's statutory Rules of the Road while securing cargo to the tractor-trailer and while operating a commercial motor vehicle.  RSMo. 304.014.

44.     At all times relevant herein, Defendant Watson owed a duty to the public, including Plaintiff, to exercise the highest degree of care while securing cargo to the tractor-trailer and while operating the commercial motor vehicle on the interstate.

45.     Defendant Watson breached this duty of care when, on June 1, 2021, he acted in a negligent manner, to wit:

     a.  Failing to inspect, properly distribute, and secure the subject cargo, the steel coils, pursuant to 49 C.F.R. Section 329.9) prior to operating the tractor-trailer;

     b.  Undertaking the securement of the subject cargo, the steel coils, without the adequate training, experience, and/or qualifications to do so;

     c.  Operating the tractor-trailer, with the steel coils, without the adequate training, experience, and/or qualifications to do so;

     d.  Failing to operate the tractor-trailer in a careful and prudent manner;

     e.  Driving too fast for conditions in violation of RSMo, Chapter 304, (commonly referred to as Missouri's statutory rules of the road);

     f.  Failing to reduce speed to avoid a collision in violation of RSMo. Chapter 304

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

(commonly referred to as Missouri's statutory rules of the road);

g.  Failing to keep a proper lookout;

h.  Failing to take proper remedial action which could have avoided the collision or minimized the impact;

i.  Failing to reduce speed to avoid a collision;

j.  Failing to keep the tractor-trailer under control at all times;

k.  Failing to exhibit the qualities of a professional driver;

l.  Driving while tired and/or fatigued;

m.  Driving while under the unsafe side-effects of prescription medication;

n.  Driving overly aggressively;

o.  Failing to utilize defensive driving tactics;

p.  Failing to maintain a safe following distance behind other motorists;

q.  Failing to maintain a speed that was safe given the weather and road conditions;

r.  Failing to warn other motorists of the impending collision so to allow them time to prepare/potentially avoid/brace for impact;

s.  Failing to stop his vehicle, slacken his speed, swerve or sound a warning in an attempt to avoid colliding with the other vehicle involved in this crash, when he could and should have done in so in the exercise of the highest degree of reasonable care; and

t.  Driving in a manner that allowed the steel coils to become dislodged from the flatbed trailer and land on the interstate.

46.    At least one of the negligent acts or omissions by Defendant Watson, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

47.    As a direct and proximate result of the negligence of Defendant Watson, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

48.    As a direct and proximate result of the negligence of Defendant Watson, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

49.    As a direct and proximate result of the negligence of Defendant Watson, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

50.    As a direct and proximate result of the negligence of Defendants Watson, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

51.    As a direct and proximate result of the negligence of Defendant Watson, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant Keaton R. Watson in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

### COUNT II
### VICARIOUS LIABILITY AGAINST J VANWINKLE TRUCKING, LLC

**COMES NOW** Plaintiff Lora Schumer, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant J VanWinkle Trucking, LLC and further states:

52.    At all times relevant herein, Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, was required to obey the Federal Motor Carrier Safety

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

Regulations and safe trucking industry standards while operating a commercial motor vehicle.

53.    At all times relevant herein, Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, was required to obey Missouri's statutory Rules of the Road while operating a commercial motor vehicle.  RSMo. 304.014.

54.    At all times relevant herein, Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, owed a duty to the public, including Plaintiff, to exercise the highest degree of care while securing the cargo to the tractor-trailer and operating the tractor-trailer on the interstate.

55.    Defendant VanWinkle, through its actual agent/employee, Defendant Watson, breached this duty of care when, on June 1, 2021, it acted in a negligent manner, to wit:

    a. Failing to inspect, properly distribute, and secure the subject cargo, the steel coils, pursuant to 49 C.F.R. Section 329.9) prior to operating the tractor-trailer;

    b. Undertaking the securement of the subject cargo, the steel coils, without the adequate training, experience, and/or qualifications to do so;

    c. Operating the tractor-trailer, with the steel coils, without the adequate training, experience, and/or qualifications to do so;

    d. Failing to operate the tractor-trailer in a careful and prudent manner;

    e. Driving too fast for conditions in violation of RSMo, Chapter 304, (commonly referred to as Missouri's statutory rules of the road);

    f. Failing to reduce speed to avoid a collision in violation of RSMo. Chapter 304 (commonly referred to as Missouri's statutory rules of the road);

    g. Failing to keep a proper lookout;

    h. Failing to take proper remedial action which could have avoided the collision or minimized the impact;

    i. Failing to reduce speed to avoid a collision;

    j. Failing to keep the tractor-trailer under control at all times;

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

k.   Failing to exhibit the qualities of a professional driver;

l.   Driving while tired and/or fatigued;

m.  Driving while under the unsafe side-effects of prescription medication;

n.   Driving overly aggressively;

o.   Failing to utilize defensive driving tactics;

p.   Failing to maintain a safe following distance behind other motorists;

q.   Failing to maintain a speed that was safe given the weather and road conditions;

r.   Failing to warn other motorists of the impending collision so to allow them time to prepare/potentially avoid/brace for impact;

s.   Failing to stop his vehicle, slacken his speed, swerve or sound a warning in an attempt to avoid colliding with the other vehicle involved in this crash, when he could and should have done in so in the exercise of the highest degree of reasonable care; and

t.   Driving in a manner that allowed the steel coils to become dislodged from the flatbed trailer and land on the interstate.

56.    At least one of the negligent acts or omissions by Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

57.    As a direct and proximate result of the negligence of Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

58.    As a direct and proximate result of the negligence of Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, Plaintiff has experienced pain,

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

59.     As a direct and proximate result of the negligence of Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

60.     As a direct and proximate result of the negligence of Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

61.     As a direct and proximate result of the negligence of Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant J VanWinkle Trucking, LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

## COUNT III
## DIRECT NEGLIGENCE OF DEFENDANT J VANWINKLE TRUCKING, LLC

**COMES NOW** Plaintiff Lora Schumer, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant J VanWinkle Trucking, LLC and further states:

62.     At all times relevant herein, Defendant VanWinkle was operating as an interstate motor carrier pursuant to authority granted to it by the U.S. Department of Transportation.

63.     At all times relevant herein, Defendant VanWinkle has been, or should have been,

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

aware of the existence of the Federal Motor Carrier Safety Regulations.

64.     At all times relevant herein, as an interstate motor carrier, Defendant VanWinkle owed a duty to the general public, including Plaintiff, to follow and comply with the Federal Motor Carrier Safety Regulations.

65.     At all times relevant herein, the various safety regulations included within Parts 385, 390, 391, 392, 393, 395, and 396, of which Defendant VanWinkle had a duty to follow, include, but are not limited to:

a.  Defendant VanWinkle had an independent duty to require observance by its drivers of any duty or prohibition imposed upon the drivers by the Federal Motor Carrier Safety Regulations.  49 C.F.R. §390.11;

b.  Defendant VanWinkle had a duty to not require or permit a driver, including Defendant Watson, to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle.  49 C.F.R. §392.3;

c.  Defendant VanWinkle had a duty to not allow or permit a driver, including Defendant Watson, to operate a commercial motor vehicle unless that person is qualified to drive a commercial motor vehicle.  49 C.F.R. §391.11;

d.  Defendant VanWinkle had an independent duty not to aid, abet, encourage or require any of its employees to violate the safety regulations contained within Chapter 390.  490 C.F.R. §390.13;

e.  Defendant VanWinkle had an independent duty to prohibit its employees from driving a commercial vehicle unless the employee had first completed and furnished to Defendant VanWinkle an application for employment that meets the requirements as set forth in 49 C.F.R. §391.21(b);

f.  Defendant VanWinkle had an independent duty to make investigations and inquiries with respect to each driver it employs and to do so in the manner prescribed in 49 C.F.R. §391.23;

g.  Defendant VanWinkle had an independent duty to obtain the motor vehicle record of every driver it employs, including Defendant Watson, at least once every twelve months in determine whether that driver continues to meet the minimum requirements for safe driving or is disqualified to drive a commercial motor vehicle.  49 C.F.R. §391.25;

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

h.  Defendant VanWinkle had an independent duty require each of its drivers, including Defendant Watson, to furnish it with a list of all violations of motor vehicle traffic laws and ordinances of which he has been convicted in the preceding 12 months.  49 C.F.R. §391.27;

i.  Defendant VanWinkle had an independent duty to prohibit its employees, including Defendant Watson, from driving until the driver had successfully completed a road test and been issued a certificate of driver's road test.  40. C.F.R. §391.31;

j.  Defendant VanWinkle had an independent duty to ensure that its drivers, including Defendant Watson, were physically qualified to operate a commercial motor vehicle and that its drivers had undergone the necessary examinations in the required timeframes as set forth within the Federal Motor Carrier Safety Regulations.  40 C.F.R. §391 – Subpart E;

k.  Defendant VanWinkle had an independent duty to inspect, repair, and maintain, all of the motor vehicles subject to its control, including the motor vehicle operated by Defendant Watson on the day of the aforementioned crash, and to ensure that the motor vehicle and all of its parts and accessories were in proper operating condition at all times, including at the time of the aforementioned crash. 40 C.F.R. §396.3; and

l.  Defendant VanWinkle had an independent duty to inspect, properly distribute, and secure the subject cargo.  40 C.F.R. §329.9.

66.    Defendant VanWinkle breached its above listed duties to the general public, including Plaintiff, by its failing to take those actions enumerated in the above paragraphs.

67.    Further, it is customarily standard in the motor carrier industry to have in place an adequate safety program administered by competent and adequately trained safety personnel to ensure that the motor carrier and its drivers are adhering to the Federal Motor Carrier Safety Regulations, including but not limited the specifically aforementioned regulations.

68.    That, at all times prior to the aforementioned collision, Defendant VanWinkle failed to have in place an adequate safety program.

69.    As a result of its inadequate and/or inexistent safety program, Defendant VanWinkle violated numerous Federal Motor Carrier Safety Regulations including, but not

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

limited to the specifically aforementioned regulations prior to the aforementioned collision involving Plaintiff.

70.    As a result of its inadequate and/or inexistent safety program, Defendant VanWinkle permitted its drivers, including Defendant Watson, to violate numerous Federal Motor Carrier Safety Regulations including, but not limited to the specifically aforementioned regulations prior to the aforementioned collision involving Plaintiff.

71.    That Defendant VanWinkle's violation of numerous Federal Motor Carrier Safety Regulations, including the specifically aforementioned regulations created a danger to the health, welfare, and safety of the motoring public, including Plaintiff.

72.    One or more of the negligent acts or omissions by Defendant VanWinkle, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

73.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff was permanently injured and sustained damages and will continue to be damaged in the manners previously described in this Petition.

74.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

75.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

76.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

77.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

78.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant J VanWinkle Trucking, LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment, and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

<u>**COUNT IV**</u>
<u>**DIRECT NEGLIGENCE AGAINST J VANWINKLE TRUCKING, LLC FOR**</u>
<u>**NEGLIGENT HIRING/RETENTION**</u>

**COMES NOW** Plaintiff Lora Schumer, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant J VanWinkle Trucking, LLC and further states:

79.    At all times prior to the aforementioned collision, Defendant VanWinkle owed a duty to the public, including Plaintiff, to diligently and adequately screen potential drivers and periodically screen hired drivers, including Defendant Watson, including but not limited to the extent mandated by the Federal Motor Carrier Safety Regulations.

80.    At all times prior to the aforementioned collision, Defendant VanWinkle owed a duty to the public, including Plaintiff, to discharge an incompetent or unsafe driver before he/she injured the public or property.

81.    Such specific duties relating to hiring and retention include, but are not limited to:

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

a.  Obtaining a completed employment application before permitting an agent, servant, and/or employee drive its commercial motor vehicle. 49 C.F.R. §391.21;

b.  Investigating the agents, servants, and/or employee's driver's employment record during the preceding three years by all reasonable means. 49 C.F.R. §§391.23(a)(2), 391.23(c);

c.  Inquiring into the agent's, servants, and/or employee's driving record within 30 days after employment begins. 49 C.F.R. §391.23(a);

d.  Requiring a successfully completed road test before commencing employment, and permitting the applicant, agent, servant, and/or employee to drive a commercial motor vehicle. 49 C.F.R. §391.31(a);

e.  Investigating the driver's safety performance history with Department of Transportation regulated employer during the preceding three years. 49 C.F.R. §391.23(2);

f.  Ensuring that its driver was qualified to properly secure cargo pursuant to 49 C.F.R. §390.5;

f.  Ensuring that its driver was qualified to operate the tractor-trailer (commercial motor vehicle) and had a valid and current DOT medical examiner's certificate. 49 C.F.R. §391.41; and

g.  Ensuring that its driver had no current diagnosis of high blood pressure, or other medical condition, likely to interfere with the ability to operate a commercial motor vehicle safely. 49 C.F.R. §391.41(b)(6).

82.    Defendant Watson was unqualified to properly secure the cargo and/or operate a commercial motor vehicle due to his driving history, inexperience, lack of skill, lack of training, lack of knowledge, and physical medical condition.

83.    That, because of Defendant Watson's aforementioned inadequacies, Defendant VanWinkle should not have hired or retained him to secure the cargo and/or operate a commercial motor vehicle.

84.    That by failing to properly and adequately screen and investigate its drivers, including Defendant Watson, before and during employment, Defendant VanWinkle violated numerous Federal Motor Carrier Safety Regulations, including but not limited to those

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

specifically identified in this count and breached its duties set forth above.

85.    Defendant VanWinkle knew or, had it obeyed the Federal Motor Carrier Safety Regulations, including but not limited to those specifically identified in this count, it would have learned of Defendant Watson's dangerous proclivities in that he was unqualified to safely secure the cargo and/or operate a commercial motor vehicle.

86.    Defendant Watson's negligent actions on the days leading up to the collision and on the day of the collision with Plaintiff was consistent with, related to, and a product of his aforementioned inadequacies in securing the cargo and/or operating a commercial motor vehicle.

87.    Defendant VanWinkle's negligent actions and omissions in hiring and retaining Defendant Watson, including its violations of the Federal Motor Carrier Safety Regulations, was the proximate cause of the injuries and damages sustained by Plaintiff.

88.    As a direct and proximate result of the independent negligence of Defendant VanWinkle, Plaintiff was permanently injured and sustained damages and will continue to be damaged in the manners previously described in this Petition.

89.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

90.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

91.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

92.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

93.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant J Van Winkle Trucking, LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

<u>**COUNT V**</u>
<u>**DIRECT NEGLIGENCE AGAINST J VANWINKLE TRUCKING, LLC FOR**</u>
<u>**NEGLIGENT TRAINING**</u>

**COMES NOW** Plaintiff Lora Schumer, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant J VanWinkle Trucking, LLC and further states:

94.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to use ordinary care to protect against unreasonable risks of harm.

95.    Specifically, Defendant VanWinkle owed a duty to the general public, including Plaintiff, to properly train its drivers, including Defendant Watson, regarding how to properly secure cargo to the trailer.

96.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to properly train its drivers, including Defendant Watson, regarding the safety regulations set forth in the Federal Motor Carrier Safety Regulations.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

97.     Such specific duties regarding training include, but are not limited to:

a.  To require and verify that its drivers pass a knowledge and skills test as prescribed by the Federal Motor Carrier Safety Regulations;

b.  To train its drivers on the Federal Motor Carrier Safety Regulations pertaining to medical certification, medical examination procedures, general qualifications, responsibilities, and disqualifications; and

c.  To ensure that its drivers have been properly trained and to show proof of that training with a training certificate.

98.     Defendant VanWinkle owed the general public, including Plaintiff, a duty to properly train its drivers, including Defendant Watson, regarding how to safely operate a commercial motor vehicle.

99.     Defendant VanWinkle owed the general public, including Plaintiff, a duty to diligently and adequately periodically screen drivers to the extent mandated by the Federal Motor Carrier Safety Regulations.

100.    Defendant VanWinkle owed a duty to the general public, including Plaintiff, a duty to provide ongoing safety courses to its drivers, including Defendant Watson.

101.    Defendant VanWinkle breached the aforesaid duties in that it failed to properly train Defendant Watson regarding the safety regulations, how to properly secure cargo to the tractor-trailer, how to safely operate a commercial motor vehicle, failed to screen its drivers, and/or failed to provide ongoing safety courses.

102.    Defendant Watson's aforementioned negligent actions and/or inactions were consistent with the fact that Defendant VanWinkle failed to properly train him on the safe securement of cargo and the safe operation of a commercial motor vehicle and/or the adherence to the Federal Motor Carrier Safety Regulations.

103.    At least one of the negligent acts or omissions by Defendant VanWinkle, as

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

104.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff was permanently injured and sustained damages and will continue to be damaged in the manners previously described in this Petition.

105.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

106.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

107.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

108.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

109.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant J VanWinkle Trucking, LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

## COUNT VI
## DIRECT NEGLIGENCE AGAINST J VAN WINKLE TRUCKING, LLC BASED UPON

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

## NEGLIGENT SUPERVISION

**COMES NOW** Plaintiff Lora Schumer, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant J VanWinkle Trucking, LLC and further states:

110.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to continuously evaluate and supervise its drivers' performance, including the performance of Defendant Watson.

111.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to not require or permit a driver, including Defendant Watson, to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to secure the cargo and/or operate the commercial motor vehicle.  49 C.F.R. §392.3.

112.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to inquire into the motor vehicle record of its drivers and give "great weight" to violations such as speeding or reckless driving.  49 C.F.R. §391.25.

113.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to ensure that its drivers were continuously physically qualified to safely operate the tractor-trailer. 49 C.F.R. §391.41, 391.43.

114.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to ensure its drivers were continuously qualified to safely secure cargo.  49 C.F.R. §390.5.

115.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to maintain a driver qualification file for each driver it employs.  49 C.F.R. §391.51.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

116.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to maintain a driver investigation history file for each driver it employs.  49 C.F.R. §391.53.

117.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to not allow or permit its on-duty drivers to be possession of drugs as listed in 49 C.F.R. §392.4(a).

118.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to not schedule a run, nor permit, nor require the operation of any commercial motor vehicle between points in such a period of time as would necessitate the commercial vehicle being operated at speeds greater than those prescribed by law.  49 C.F.R. §392.6.

119.    Defendant VanWinkle breached its above listed duties to the general public, including Plaintiff, by its failing do those things enumerated in the above paragraphs and failing to properly supervise Defendant Watson, Defendant VanWinkle's commercial motor vehicle driver, who was unqualified, incompetent and should have been discharged prior to this crash.

120.    At least one of the negligent acts or omissions by Defendant VanWinkle, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

121.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff was permanently injured and sustained damages and will continue to be damaged in the manners previously described in this Petition.

122.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

123.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

124.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

125.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

126.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant J Van Winkle Trucking, LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

<u>**COUNT VII**</u>
<u>**NEGLIGENCE AGAINST NUCOR CORPORATION d/b/a NUCOR STEEL**</u>

**COMES NOW** Plaintiff Lora Schumer, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant Nucor Corporation d/b/a Nucor Steel and further states:

127.    Defendant Nucor was a seller/shipper within the meaning of statutes and regulations pertinent to the Federal Motor Carrier Safety Regulations.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

128.     Defendant Nucor undertook the securement of the cargo (steel coils) and/or directed others regarding the securement of the cargo (steel coils) to the trailer involved in the incident at issue.

129.     In doing so, Defendant Nucor owed a duty to the general public, including Plaintiff, to safely secure the cargo to the trailer prior to transport and/or to properly and safely direct others regarding the securement of the cargo.

130.     Defendant Nucor breached the aforesaid duty in that it failed to safely secure the cargo pursuant to accepted safety standards and/or directed others to secure the cargo in an unsafe manner.

131.     Defendant Nucor owed a duty to the general public, including Plaintiff, to only hire safe, experienced, and qualified individuals/entities to secure and cargo and/or transport the cargo.

132.     Defendant Nucor hired and accepted Defendant PGT Trucking as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant PGT Trucking during the transaction relevant hereto.

133.     Defendant Nucor knew and/or should have known that Defendant PGT Trucking was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely secure the cargo to the trailer and/or transport the cargo and/or hire a safe End Carrier to transport the cargo without adequate instruction, guidance, attention, and/or oversight.

134.     Defendant Nucor hired and accepted Defendant Kinder Morgan as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant Kinder Morgan during the transaction relevant hereto.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

135.    Defendant Nucor knew and/or should have known that Defendant Kinder Morgan was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely unload and store the cargo and/or secure the cargo to the trailer without adequate instruction, guidance, attention, and/or oversight.

136.    Defendant Nucor breached the aforesaid duties in that it knew, or should have known, that Defendant PGT Trucking and/or Defendant Kinder Morgan were not safe, experienced, and qualified to secure the cargo and/or transport the cargo.

137.    The inexperienced, reckless, careless, incompetent, and/or otherwise unfit handling of the steel products that ultimately hurt Plaintiff in the course of the collision were a direct and proximate result of the negligent conduct of Defendant Nucor.

138.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

139.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff was required to expend and incur medical expenses.

140.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff will more likely than not require future medical care and will thus incur future medical expenses.

141.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff missed significant time from work and missed additional time for her reasonable and necessary medical care, resulting in lost wages.

142.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff's ability to work in the future is limited and her ability to earn wages is diminished by the injuries she suffered in this crash.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

143.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff has suffered and will more likely than not continue to suffer into the future, pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life, all as a result of her injuries.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant Nucor Corporation d/b/a Nucor Steel in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

## COUNT VIII
## NEGLIGENCE AGAINST KINDER MORGAN BULK TERMINALS LLC

**COMES NOW** Plaintiff Lora Schumer, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant Kinder Morgan Bulk Terminals LLC and further states:

144.    Defendant Kinder Morgan received, unloaded, stored, secured to the trailer at issue, and/or directed others regarding the securement, the steel coils prior to transport from Arkansas to Missouri.

145.    In doing so, Defendant Kinder Morgan owed a duty to the general public, including Plaintiff, to safely receive, unload, store, and secure the cargo to the trailer, and/or direct others to safely secure the cargo.

146.    Defendant Kinder Morgan breached the aforesaid duty in that it failed to safely unload, store, secure, and/or direct others regarding the securement, the steel coils pursuant to accepted safety standards.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

147.    The inexperienced, reckless, careless, incompetent, and/or otherwise unfit handling of the steel products that ultimately hurt Plaintiff in the course of the collision were a direct and proximate result of the negligent conduct of Defendant Kinder Morgan.

148.    As a direct and proximate result of the negligence of Defendant Kinder Morgan, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

149.    As a direct and proximate result of the negligence of Defendant Kinder Morgan, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

150.    As a direct and proximate result of the negligence of Defendant Kinder Morgan, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

151.    As a direct and proximate result of the negligence of Defendant Kinder Morgan, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

152.    As a direct and proximate result of the negligence of Defendant Kinder Morgan, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant Kinder Morgan Bulk Terminals LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

## COUNT IX
## VICARIOUS LIABILITY AGAINST PGT TRUCKING, INC.

**COMES NOW** Plaintiff Lora Schumer, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

as if they were set forth herein at length against Defendant PGT Trucking, Inc., and further states:

153.    At all times relevant herein, Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, was required to obey the Federal Motor Carrier Safety Regulations and safe trucking industry standards while operating a commercial motor vehicle.

154.    At all times relevant herein, Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, was required to obey Missouri's statutory Rules of the Road while operating a commercial motor vehicle.  RSMo. 304.014.

155.    At all times relevant herein, Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, owed a duty to the public, including Plaintiff, to exercise the highest degree of care while securing the cargo to the tractor-trailer and operating the tractor-trailer on the interstate.

156.    Defendant PGT Trucking, through its apparent agent/employee, Defendant Watson, breached this duty of care when, on June 1, 2021, it acted in a negligent, careless, and reckless manner, to wit:

   a. Failing to inspect, properly distribute, and secure the subject cargo, the steel coils, pursuant to 49 C.F.R. Section 329.9) prior to operating the tractor-trailer;

   b. Undertaking the securement of the subject cargo, the steel coils, without the adequate training, experience, and/or qualifications to do so;

   c. Operating the tractor-trailer, with the steel coils, without the adequate training, experience, and/or qualifications to do so;

   d. Failing to operate the tractor-trailer in a careful and prudent manner;

   e. Driving too fast for conditions in violation of RSMo, Chapter 304, (commonly referred to as Missouri's statutory rules of the road);

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

f.  Failing to reduce speed to avoid a collision in violation of RSMo. Chapter 304 (commonly referred to as Missouri's statutory rules of the road);

g.  Failing to keep a proper lookout;

h.  Failing to take proper remedial action which could have avoided the collision or minimized the impact;

i.  Failing to reduce speed to avoid a collision;

j.  Failing to keep the tractor-trailer under control at all times;

k.  Failing to exhibit the qualities of a professional driver;

l.  Driving while tired and/or fatigued;

m. Driving while under the unsafe side-effects of prescription medication;

n.  Driving overly aggressively;

o.  Failing to utilize defensive driving tactics;

p.  Failing to maintain a safe following distance behind other motorists;

q.  Failing to maintain a speed that was safe given the weather and road conditions;

r.  Failing to warn other motorists of the impending collision so to allow them time to prepare/potentially avoid/brace for impact;

s.  Failing to stop his vehicle, slacken his speed, swerve or sound a warning in an attempt to avoid colliding with the other vehicle involved in this crash, when he could and should have done in so in the exercise of the highest degree of reasonable care; and

t.  Driving in a manner that allowed the steel coils to become dislodged from the flatbed trailer and land on the interstate.

157.    At least one of the negligent acts or omissions by Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

158.    As a direct and proximate result of the negligence of Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

159.    As a direct and proximate result of the negligence of Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

160.    As a direct and proximate result of the negligence of Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

161.    As a direct and proximate result of the negligence of Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

162.    As a direct and proximate result of the negligence of Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant PGT Trucking, Inc., in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

<u>**COUNT X**</u>
<u>**DIRECT NEGLIGENCE OF DEFENDANT PGT TRUCKING, INC.**</u>

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

**COMES NOW** Plaintiff Lora Schumer, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant PGT Trucking, Inc. and further states:

163.    At all times relevant herein, Defendant PGT Trucking was operating as an interstate motor carrier pursuant to authority granted to it by the U.S. Department of Transportation.

164.    At all times relevant herein, Defendant PGT Trucking has been, or should have been, aware of the existence of the Federal Motor Carrier Safety Regulations.

165.    At all times relevant herein, as an interstate motor carrier, Defendant PGT Trucking owed a duty to the general public, including Plaintiff, to follow and comply with the Federal Motor Carrier Safety Regulations.

166.    At all times relevant herein, the various safety regulations included within Parts 385, 390, 391, 392, 393, 395, and 396, of which Defendant PGT Trucking had a duty to follow, include, but are not limited to:

  a.  Defendant PGT Trucking had an independent duty to require observance by its drivers of any duty or prohibition imposed upon the drivers by the Federal Motor Carrier Safety Regulations.  49 C.F.R. §390.11;

  b.  Defendant PGT Trucking had a duty to not require or permit a driver, including Defendant Watson, to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle.  49 C.F.R. §392.3;

  c.  Defendant PGT Trucking had a duty to not allow or permit a driver, including Defendant Watson, to operate a commercial motor vehicle unless that person is qualified to drive a commercial motor vehicle.  49 C.F.R. §391.11;

  d.  Defendant PGT Trucking had an independent duty not to aid, abet, encourage or require any of its employees to violate the safety regulations contained within Chapter 390.  490 C.F.R. §390.13;

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

e.  Defendant PGT Trucking had an independent duty to prohibit its employees from driving a commercial vehicle unless the employee had first completed and furnished to Defendant PGT Trucking an application for employment that meets the requirements as set forth in 49 C.F.R. §391.21(b);

f.  Defendant PGT Trucking had an independent duty to make investigations and inquiries with respect to each driver it employs and to do so in the manner prescribed in 49 C.F.R. §391.23;

g.  Defendant PGT Trucking had an independent duty to obtain the motor vehicle record of every driver it employs, including Defendant Watson, at least once every twelve months in determine whether that driver continues to meet the minimum requirements for safe driving or is disqualified to drive a commercial motor vehicle.  49 C.F.R. §391.25;

h.  Defendant PGT Trucking had an independent duty require each of its drivers, including Defendant Watson, to furnish it with a list of all violations of motor vehicle traffic laws and ordinances of which he has been convicted in the preceding 12 months.  49 C.F.R. §391.27;

i.  Defendant PGT Trucking had an independent duty to prohibit its employees, including Defendant Watson, from driving until the driver had successfully completed a road test and been issued a certificate of driver's road test.  40. C.F.R. §391.31;

j.  Defendant PGT Trucking had an independent duty to ensure that its drivers, including Defendant Watson, were physically qualified to operate a commercial motor vehicle and that its drivers had undergone the necessary examinations in the required timeframes as set forth within the Federal Motor Carrier Safety Regulations.  40 C.F.R. §391 – Subpart E;

k.  Defendant PGT Trucking had an independent duty to inspect, repair, and maintain, all of the motor vehicles subject to its control, including the motor vehicle operated by Defendant Watson on the day of the aforementioned crash, and to ensure that the motor vehicle and all of its parts and accessories were in proper operating condition at all times, including at the time of the aforementioned crash.  40 C.F.R. §396.3; and

l.  Defendant PGT Trucking had an independent duty to inspect, properly distribute, and secure the subject cargo.  40 C.F.R. §329.9.

167.    Defendant PGT Trucking breached its above listed duties to the general public, including Plaintiff, by its failing do those things enumerated in the above paragraphs and

168.    Further, it is customarily standard in the motor carrier industry to have in place an

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

adequate safety program administered by competent and adequately trained safety personnel to ensure that the motor carrier and its drivers are adhering to the Federal Motor Carrier Safety Regulations, including but not limited the specifically aforementioned regulations.

169.    That, at all times prior to the aforementioned collision, Defendant PGT Trucking failed to have in place an adequate safety program.

170.    As a result of its inadequate and/or inexistent safety program, Defendant PGT Trucking violated numerous Federal Motor Carrier Safety Regulations including, but not limited to the specifically aforementioned regulations prior to the aforementioned collision involving Plaintiff.

171.    As a result of its inadequate and/or inexistent safety program, Defendant PGT Trucking allowed its drivers, including Defendant Watson, to violate numerous Federal Motor Carrier Safety Regulations including, but not limited to the specifically aforementioned regulations prior to the aforementioned collision involving Plaintiff.

172.    That Defendant PGT Trucking's violation of numerous Federal Motor Carrier Safety Regulations, including the specifically aforementioned regulations created a danger to the health, welfare, and safety of the motoring public, including Plaintiff.

173.    At least one of the negligent acts or omissions by Defendant PGT Trucking, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

174.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff was permanently injured and sustained damages and will continue to be damaged in the manners previously described in this Petition.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

175.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

176.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

177.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

178.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

179.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

180.    Defendant PGT Trucking knew or had information from which it, in the exercise of ordinary care, could have known that such conduct as described herein created a high degree of probability of injury to the motoring public such as Plaintiff.

181.    The conduct of Defendant PGT Trucking, as described herein, specifically including violations of Missouri state law and the various Federal Motor Carrier Safety Regulations, was willful, wanton, and reckless, and shows complete indifference and conscious disregard for the safety of the motoring public.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant PGT Trucking, Inc. in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment, and post-judgment interests, punitive damages, and for such other relief this Court

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

deems just and proper under the circumstances.

**COUNT XI**
**DIRECT NEGLIGENCE AGAINST PGT TRUCKING, INC.**

**COMES NOW** Plaintiff Lora Schumer, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant PGT Trucking, Inc. and further states:

182.    Defendant PGT Trucking was a carrier within the meaning of statutes and regulations pertinent to the Federal Motor Carrier Safety Regulations.

183.    Defendant PGT Trucking undertook the securement of the cargo (steel coils) and/or directed others regarding the securement of the cargo (steel coils) to the trailer involved in the incident at issue.

184.    In doing so, Defendant PGT Trucking owed a duty to the general public, including Plaintiff, to safely secure the cargo to the trailer prior to transport and/or to properly and safely direct others regarding the securement of the cargo.

185.    Defendant PGT Trucking breached the aforesaid duty in that it failed to safely secure the cargo pursuant to accepted safety standards and/or directed others to secure the cargo in an unsafe manner.

186.    Defendant PGT Trucking owed a duty to the general public, including Plaintiff, to only hire safe, experienced, and qualified individuals/entities to secure and cargo and/or transport the cargo.

187.    Defendant PGT Trucking hired and accepted Defendant VanWinkle as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant VanWinkle during the transaction relevant hereto.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

188.    Defendant PGT Trucking knew and/or should have known that Defendant VanWinkle was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely secure the cargo to the trailer and/or transport the cargo without adequate instruction, guidance, attention, and/or oversight.

189.    Defendant PGT Trucking hired and accepted Defendant Kinder Morgan as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant Kinder Morgan during the transaction relevant hereto.

190.    Defendant PGT Trucking knew and/or should have known that Defendant Kinder Morgan was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely unload and store the cargo and/or secure the cargo to the trailer without adequate instruction, guidance, attention, and/or oversight.

191.    Defendant PGT Trucking breached the aforesaid duties in that it knew, or should have known, that Defendant VanWinkle and/or Defendant Kinder Morgan were not safe, experienced, and qualified to secure the cargo and/or transport the cargo.

192.    The inexperienced, reckless, careless, incompetent, and/or otherwise unfit handling of the steel products that ultimately hurt Plaintiff in the course of the collision were a direct and proximate result of the negligent conduct of Defendant PGT Trucking.

193.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

194.    As a direct and proximate result of the negligence of Defendant PGT Trucking Plaintiff was required to expend and incur medical expenses.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

195.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff will more likely than not require future medical care and will thus incur future medical expenses.

196.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff missed significant time from work and missed additional time for her reasonable and necessary medical care, resulting in lost wages.

197.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff's ability to work in the future is limited and her ability to earn wages is diminished by the injuries she suffered in this crash.

198.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff has suffered and will more likely than not continue to suffer into the future, pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life, all as a result of her injuries.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant PGT Trucking, Inc. in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

**COUNT XII**
**NEGLIGENCE AGAINST HEIDTMAN STEEL PRODUCTS, INC.**

**COMES NOW** Plaintiff Lora Schumer, by and through her attorney, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant Heidtman Steel Products, Inc. and further states:

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

199.    Defendant Heidtman Steel undertook the securement of the cargo (steel coils) and/or directed others regarding the securement of the cargo (steel coils) to the trailer involved in the incident at issue.

200.    In doing so, Defendant Heidtman Steel owed a duty to the general public, including Plaintiff, to safely secure the cargo to the trailer prior to transport and/or to properly and safely direct others regarding the securement of the cargo.

201.    Defendant Heidtman Steel breached the aforesaid duty in that it failed to safely secure the cargo pursuant to accepted safety standards and/or directed others to secure the cargo in an unsafe manner.

202.    Defendant Heidtman Steel owed a duty to the general public, including Plaintiff, to only hire safe, experienced, and qualified individuals/entities to secure and cargo and/or transport the cargo.

203.    Defendant Heidtman Steel hired and accepted Defendant PGT Trucking as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant PGT Trucking during the transaction relevant hereto.

204.    Defendant Heidtman Steel knew and/or should have known that Defendant PGT Trucking was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely secure the cargo to the trailer and/or transport the cargo without adequate instruction, guidance, attention, and/or oversight.

205.    Defendant Heidtman Steel hired and accepted Defendant Kinder Morgan as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant Kinder Morgan during the transaction relevant hereto.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

206.    Defendant Heidtman Steel knew and/or should have known that Defendant Kinder Morgan was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely unload and store the cargo and/or secure the cargo to the trailer without adequate instruction, guidance, attention, and/or oversight.

207.    Defendant Heidtman Steel breached the aforesaid duties in that it knew, or should have known, that Defendant PGT Trucking and/or Defendant Kinder Morgan were not safe, experienced, and qualified to secure the cargo and/or transport the cargo.

208.    The inexperienced, reckless, careless, incompetent, and/or otherwise unfit handling of the steel products that ultimately hurt Plaintiff in the course of the collision were a direct and proximate result of the negligent conduct of Defendant Heidtman Steel.

209.    As a direct and proximate result of the negligence of Defendant Heidtman Steel, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

210.    As a direct and proximate result of the negligence of Defendant Heidtman Steel Plaintiff was required to expend and incur medical expenses.

211.    As a direct and proximate result of the negligence of Defendant Heidtman Steel, Plaintiff will more likely than not require future medical care and will thus incur future medical expenses.

212.    As a direct and proximate result of the negligence of Defendant Heidtman Steel, Plaintiff missed significant time from work and missed additional time for her reasonable and necessary medical care, resulting in lost wages.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

213.    As a direct and proximate result of the negligence of Defendant Heidtman Steel, Plaintiff's ability to work in the future is limited and her ability to earn wages is diminished by the injuries she suffered in this crash.

214.    As a direct and proximate result of the negligence of Defendant Heidtman Steel, Plaintiff has suffered and will more likely than not continue to suffer into the future, pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life, all as a result of her injuries.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant Heidtman Steel Products, Inc. in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

### COUNT XIII
### NEGLIGENCE AGAINST STANLEY BLACK & DECKER CORPORATION
### f/k/a WATERLOO INDUSTRIES

**COMES NOW** Plaintiff Lora Schumer, by and through her attorney, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant Stanley Black & Decker Corporation f/k/a Waterloo Industries and further states:

215.    Defendant Black & Decker undertook the securement of the cargo (steel coils) and/or directed others regarding the securement of the cargo (steel coils) to the trailer involved in the incident at issue.

216.    In doing so, Defendant Black & Decker owed a duty to the general public, including Plaintiff, to safely secure the cargo to the trailer prior to transport and/or to properly and safely direct others regarding the securement of the cargo.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

217.    Defendant Black & Decker breached the aforesaid duty in that it failed to safely secure the cargo pursuant to accepted safety standards and/or directed others to secure the cargo in an unsafe manner.

218.    Defendant Black & Decker owed a duty to the general public, including Plaintiff, to only hire safe, experienced, and qualified individuals/entities to secure and cargo and/or transport the cargo.

219.    Defendant Black & Decker hired and accepted Defendant PGT Trucking as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant PGT Trucking during the transaction relevant hereto.

220.    Defendant Black & Decker knew and/or should have known that Defendant PGT Trucking was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely secure the cargo to the trailer and/or transport the cargo without adequate instruction, guidance, attention, and/or oversight.

221.    Defendant Black & Decker hired and accepted Defendant Kinder Morgan as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant Kinder Morgan during the transaction relevant hereto.

222.    Defendant Black & Decker knew and/or should have known that Defendant Kinder Morgan was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely unload and store the cargo and/or secure the cargo to the trailer without adequate instruction, guidance, attention, and/or oversight.

223.    Defendant Black & Decker breached the aforesaid duties in that it knew, or should have known, that Defendant PGT Trucking and/or Defendant Kinder Morgan were not safe, experienced, and qualified to secure the cargo and/or transport the cargo.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

224.    The inexperienced, reckless, careless, incompetent, and/or otherwise unfit handling of the steel products that ultimately hurt Plaintiff in the course of the collision were a direct and proximate result of the negligent conduct of Defendant Black & Decker.

225.    As a direct and proximate result of the negligence of Defendant Black & Decker, Plaintiff suffered injury to her head, neck and back chest, left forearm, left elbow and said injuries are painful, permanent and progressive.

226.    As a direct and proximate result of the negligence of Defendant Black & Decker Plaintiff was required to expend and incur medical expenses.

227.    As a direct and proximate result of the negligence of Defendant Black & Decker, Plaintiff will more likely than not require future medical care and will thus incur future medical expenses.

228.    As a direct and proximate result of the negligence of Defendant Black & Decker, Plaintiff missed significant time from work and missed additional time for her reasonable and necessary medical care, resulting in lost wages.

229.    As a direct and proximate result of the negligence of Defendant Black & Decker, Plaintiff's ability to work in the future is limited and her ability to earn wages is diminished by the injuries she suffered in this crash.

230.    As a direct and proximate result of the negligence of Defendant Black & Decker, Plaintiff has suffered and will more likely than not continue to suffer into the future, pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life, all as a result of her injuries.

**WHEREFORE** Plaintiff Lora Schumer prays for judgment against Defendant Stanley Black & Decker Corporation f/k/a Waterloo Industries a sum in excess of Twenty-Five

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 11, 2023 - 03:21 PM

Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

Respectfully submitted,

**COOK, BARKETT, PONDER, & WOLZ, L.C.**

By:    _/s/:Daniel J. Grimm_____
          Daniel J. Grimm #59209
          1610 N. Kingshighway, Suite 201
          Cape Girardeau, Missouri 63701
          Telephone: (573) 335-6651
          Facsimile: (573) 200-8401
          Email: dgrimm@cbpw-law.com
          **ATTORNEY FOR PLAINTIFF**

**THE SUMNER LAW GROUP, LLC**

By:    _/s/ K. Lindsay Rakers_____
          Brent A. Sumner, # 59460
          Andrew Martin, #62657
          K. Lindsay Rakers, #51754
          7777 Bonhomme Ave, Ste. 2100
          Clayton, MO 63105
          Telephone: (314) 669-0048
          Facsimile: (888) 259-7550
          brent@sumnerlawgroup.com
          andrew@sumnerlawgroup.com
          lindsay@sumnerlawgroup.com
          **CO-COUNSEL FOR PLAINTIFF**

EXHIBIT  C

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

**IN THE CIRCUIT COURT OF THE COUNTY OF CAPE GIRARDEAU**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| NINA MARSHALL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22CG-CC00245 |
| | ) | Consolidated with: |
| J VANWINKLE TRUCKING LLC; | ) | Case No. 22CG-CC00195 |
| KEATON R WATSON; | ) | |
| PGT TRUCKING, INC.; | ) | In Excess of $25,000 |
| NUCOR CORP., d/b/a NUCOR STEEL; | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| HEIDTMAN STEEL PRODUCTS, INC.; | ) | |
| Serve: | ) | |
| Kathleen Ann Uram | ) | |
| 10 Northgate Industrial Drive | ) | |
| Granite City, IL 62040-6805 | ) | |
| | ) | |
| STANLEY BLACK & DECKER, INC f/k/a | ) | |
| WATERLOO INDUSTRIES, INC.; and | ) | |
| Serve: | ) | |
| Illinois Corporation Service Company | ) | |
| 801 Adlai Stevenson Drive | ) | |
| Springfield, IL 62703-4261 | ) | |
| | ) | |
| KINDER MORGAN BULK TERMINALS LLC | ) | |
| Serve: | ) | |
| Capitol Corporate Services, Inc. | ) | |
| 300 S. Spring St, Ste 900 | ) | |
| Little Rock, AR 72201 | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED PETITION FOR DAMAGES**

COMES NOW Plaintiff, Nina Marshall, by and through her attorneys of record, and for

her causes of action against the Defendants named in this Second Amended Petition for

Damages, hereby states and alleges as follows:

**GENERAL ALLEGATIONS**

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

1.      At all times relevant herein, Plaintiff, Nina Marshall, (hereinafter "Plaintiff") is and was a resident of Old Appleton, County of Cape Girardeau and a citizen of Missouri.

2.      At all times relevant herein, Defendant Nucor Corporation d/b/a Nucor Steel (hereinafter "Defendant Nucor"), is and was a foreign corporation incorporated in Delaware and engaged in the business of manufacturing, selling, and shipping products, including steel coils, throughout the country via interstate commerce.

3.      On some date prior to June 1, 2021, Defendant Nucor melted and manufactured two steel coils with a combined weight in excess of 43,000 pounds (hereinafter "the steel coils").

4.      At all times relevant herein, Defendant Kinder Morgan Bulk Terminals LLC (hereinafter "Defendant Kinder Morgan"), is and was a foreign LLC created in Louisiana and engaged in the business of storing and distributing property, including steel coils, throughout the country via interstate commerce.

5.      On some date prior to June 1, 2021, Defendant Nucor hired Defendant Kinder Morgan to receive and store the steel coils in Blytheville, Arkansas until the time the steel coils were purchased.

6.      On some date prior to June 1, 2021, Defendant Kinder Morgan received, from Defendant Nucor, and stored the steel coils at Defendant Kinder Morgan's Blytheville, Arkansas location.

7.      At all times relevant herein, Defendant Heidtman Steel Products, Inc. (hereinafter "Defendant Heidtman Steel"), is and was a foreign corporation incorporated in Ohio and doing business nationwide.

8.      On some date prior to June 1, 2021, Defendant Heidtman Steel purchased the steel coils with the intent of distributing the steel coils.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

9.      At all times relevant herein, Defendant Stanley Black & Decker, Inc. f/k/a Waterloo Industries, Inc. (hereinafter "Defendant Black & Decker"), is and was a foreign corporation incorporated in Connecticut and doing business nationwide.

10.      On some date prior to June 1, 2021, Defendant Black & Decker contracted with Defendant Nucor and/or Defendant Heidtman Steel for the purchased steel coils to be delivered to Defendant Black & Decker's Sedalia, Missouri location.

11.      At all times relevant herein, Defendant PGT Trucking, Inc. (hereinafter "Defendant PGT Trucking"), is and was a foreign company incorporated in Pennsylvania and operating as an interstate, for-hire commercial motor carrier, USDOT #192897.

12.      On some date prior to June 1, 2021, Defendant Nucor entered into a Master Agreement with Defendant PGT Trucking which provided that PGT Trucking, as a motor carrier, would transport steel and steel products on behalf of Defendant Nucor.

13.      Pursuant to the Master Agreement referenced in Para. #12, Defendant PGT Trucking was to transport, or arrange for the transport, of the steel coils from Defendant Kinder Morgan's Blytheville, Arkansas location to Sedalia, Missouri.

14.      At all times relevant herein, Defendant J VanWinkle Trucking, LLC (hereinafter "Defendant VanWinkle"), is and was a domestic company organized under the laws of Missouri and was operating as an interstate, for-hire commercial motor carrier, USDOT #2927425.

15.      On some date prior to June 1, 2021, Defendant PGT Trucking hired Defendant VanWinkle to serve as the "End Carrier" and transport the steel coils.

16.      At all times relevant herein, Defendant Keaton R. Watson (hereinafter "Defendant Watson"), is and was a resident of Winona, County of Shannon and a citizen of Missouri.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

17.    At all times relevant herein, Defendant Watson was the actual agent/employee of Defendant VanWinkle.

18.    At all times relevant herein, Defendant VanWinkle was acting individually and through its drivers, agents, servants, and/or employees, including Defendant Watson, each of whom were acting within the course and scope of their employment with Defendant VanWinkle.

19.    The Shipping Order/Bill of Lading #1194074 related to the transport of the steel coils designates Defendant PGT Trucking as the "carrier".

20.    At all times relevant herein, Defendant Watson was the apparent agent/employee of Defendant PGT Trucking.

21.    At all times relevant herein, Defendant Watson was operating a 2004 Peterbilt tractor-trailer (hereinafter "the tractor-trailer") in the course and scope of his employment with Defendant VanWinkle and Defendant PGT Trucking.

22.    At all times relevant herein, Defendant VanWinkle owned, leased, controlled, and/or operated the tractor-trailer that was involved in this crash.

23.    In addition to acting as a carrier, at all times relevant herein, Defendant PGT Trucking was also acting as an agent for the shipper(s) involved herein and/or was subject to the retained control of said shipper(s).

24.    In its relevant parts, the Federal Motor Carrier Safety Regulations define "Motor Carrier" as a for-hire motor carrier or a private motor carrier; including a motor carrier's agents, officers and representatives, as well as employees responsible for hiring, supervising, training, assigning, or dispatching of drivers and employees concerned with the installation, inspection, and maintenance of motor vehicle equipment and/or accessories; this definition includes the term "employer."  49 C.F.R. §390.5.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

25.     At all times relevant herein, Defendant VanWinkle and Defendant PGT Trucking were "Motor Carriers" as that term is defined by the Federal Motor Carrier Safety Regulations.

26.     In its relevant parts, the Motor Carrier Safety Regulations define "Motor Vehicle" as any vehicle, machine, tractor, trailer, or semi-trailer propelled or drawn by mechanical power and used upon the highways in the transportation of passengers or property, or any combination thereof determined by the Federal Motor Carrier Safety Administration.  49 C.F.R. §390.5.

27.     At all times relevant to this case, the tractor-trailer driven by Defendant Watson was a "Motor Vehicle," as defined by the Motor Carrier Safety Regulations.

28.     In its relevant parts, the Motor Carrier Safety Regulations define an "Employee" as any individual, other than an employer, who is employed by an employer and who, in the course of his or her employment directly, affects commercial motor vehicle safety.  "Employee" includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle).  49 C.F.R. §390.5.

29.     At all times relevant herein, Defendant Watson was a driver of the tractor-trailer, a commercial motor vehicle, and therefore, was an "Employee," as defined by the Motor Carrier Safety Regulations.

30.     At all times relevant herein, Defendant VanWinkle and Defendant PGT Trucking were subject to and required to abide by the rules and regulations contained and set forth in Title 49, Code of Federal Regulations (Federal Motor Carrier Safety Regulations) and RSMo. 307.400 while operating as interstate commercial motor carriers.

31.     At all times relevant herein, Defendant Watson, was subject to and required to abide by the rules and regulations contained and set forth in Title 49, Code of Federal Regulations (Federal Motor Carrier Safety Regulations) and RSMo. 307.400 while operating a

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

commercial motor vehicle.

32.     At all times relevant herein, Interstate 55 in the County of Cape Girardeau, State of Missouri, is and was an open and public roadway.

33.     At all times relevant herein, Defendant VanWinkle's name, DOT number and MC number were displayed on the tractor-trailer being driven by Defendant Watson.

34.     On June 1, 2021, Plaintiff was operating her vehicle traveling northbound on Missouri Interstate 55.

35.     On June 1, 2021, Defendant Watson was operating his commercial motor vehicle traveling northbound on Missouri Interstate 55.

36.     At said time and place, Defendant Watson operated his commercial motor vehicle in a manner that was dangerous given that traffic was stopped ahead in the northbound traveling lane on Missouri Interstate 55.

37.     At said time and place, Defendant Watson noticed the traffic in front of him was stopped and as a result, abruptly swerved the tractor-trailer into the center median in an attempt to avoid making contact with other vehicles.

38.     At said time and place, Defendant Watson's actions or nonactions caused the tractor-trailer to strike another vehicle(s).

39.     At said time and place, the steel coils on the flatbed of the tractor-trailer operated by Defendant Watson came off of the trailer and landed on Interstate 55.

40.     At said time and place, one of the steel coils struck Plaintiff's vehicle as Plaintiff's vehicle was stopped on Interstate 55, and caused her vehicle to spin into the median.

41.     Plaintiff was in no way negligent in the operation of her vehicle at the time of the crash.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

## COUNT I
## NEGLIGENCE OF DEFENDANT KEATON R. WATSON

**COMES NOW** Plaintiff Nina Marshall, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant Keaton R. Watson and further states:

42.    At all times relevant herein, Defendant Watson was required to obey the Federal Motor Carrier Safety Regulations and safe trucking industry standards while securing cargo to the tractor-trailer and while operating a commercial motor vehicle.

43.    At all times relevant herein, Defendant Watson was required to obey Missouri's statutory Rules of the Road while securing cargo to the tractor-trailer and while operating a commercial motor vehicle.  RSMo. 304.014.

44.    At all times relevant herein, Defendant Watson owed a duty to the public, including Plaintiff, to exercise the highest degree of care while securing cargo to the tractor-trailer and while operating the commercial motor vehicle on the interstate.

45.    Defendant Watson breached this duty of care when, on June 1, 2021, he acted in a negligent manner, to wit:

   a.   Failing to inspect, properly distribute, and secure the subject cargo, the steel coils, pursuant to 49 C.F.R. Section 329.9) prior to operating the tractor-trailer;

   b.   Undertaking the securement of the subject cargo, the steel coils, without the adequate training, experience, and/or qualifications to do so;

   c.   Operating the tractor-trailer, with the steel coils, without the adequate training, experience, and/or qualifications to do so;

   d.   Failing to operate the tractor-trailer in a careful and prudent manner;

   e.   Driving too fast for conditions in violation of RSMo, Chapter 304, (commonly referred to as Missouri's statutory rules of the road);

   f.   Failing to reduce speed to avoid a collision in violation of RSMo. Chapter 304

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

(commonly referred to as Missouri's statutory rules of the road);

g.  Failing to keep a proper lookout;

h.  Failing to take proper remedial action which could have avoided the collision or minimized the impact;

i.  Failing to reduce speed to avoid a collision;

j.  Failing to keep the tractor-trailer under control at all times;

k.  Failing to exhibit the qualities of a professional driver;

l.  Driving while tired and/or fatigued;

m.  Driving while under the unsafe side-effects of prescription medication;

n.  Driving overly aggressively;

o.  Failing to utilize defensive driving tactics;

p.  Failing to maintain a safe following distance behind other motorists;

q.  Failing to maintain a speed that was safe given the weather and road conditions;

r.  Failing to warn other motorists of the impending collision so to allow them time to prepare/potentially avoid/brace for impact;

s.  Failing to stop his vehicle, slacken his speed, swerve or sound a warning in an attempt to avoid colliding with the other vehicle involved in this crash, when he could and should have done in so in the exercise of the highest degree of reasonable care; and

t.  Driving in a manner that allowed the steel coils to become dislodged from the flatbed trailer and land on the interstate.

46.    At least one of the negligent acts or omissions by Defendant Watson, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

47.      As a direct and proximate result of the negligence of Defendant Watson, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

48.      As a direct and proximate result of the negligence of Defendant Watson, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

49.      As a direct and proximate result of the negligence of Defendant Watson, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

50.      As a direct and proximate result of the negligence of Defendants Watson, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

51.      As a direct and proximate result of the negligence of Defendant Watson, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant Keaton R. Watson in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

## COUNT II
## VICARIOUS LIABILITY AGAINST J VANWINKLE TRUCKING, LLC

**COMES NOW** Plaintiff Nina Marshall, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant J VanWinkle Trucking, LLC and further states:

52.      At all times relevant herein, Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, was required to obey the Federal Motor Carrier Safety

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

Regulations and safe trucking industry standards while operating a commercial motor vehicle.

53.    At all times relevant herein, Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, was required to obey Missouri's statutory Rules of the Road while operating a commercial motor vehicle.  RSMo. 304.014.

54.    At all times relevant herein, Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, owed a duty to the public, including Plaintiff, to exercise the highest degree of care while securing the cargo to the tractor-trailer and operating the tractor-trailer on the interstate.

55.    Defendant VanWinkle, through its actual agent/employee, Defendant Watson, breached this duty of care when, on June 1, 2021, it acted in a negligent manner, to wit:

    a.  Failing to inspect, properly distribute, and secure the subject cargo, the steel coils, pursuant to 49 C.F.R. Section 329.9) prior to operating the tractor-trailer;

    b.  Undertaking the securement of the subject cargo, the steel coils, without the adequate training, experience, and/or qualifications to do so;

    c.  Operating the tractor-trailer, with the steel coils, without the adequate training, experience, and/or qualifications to do so;

    d.  Failing to operate the tractor-trailer in a careful and prudent manner;

    e.  Driving too fast for conditions in violation of RSMo, Chapter 304, (commonly referred to as Missouri's statutory rules of the road);

    f.  Failing to reduce speed to avoid a collision in violation of RSMo. Chapter 304 (commonly referred to as Missouri's statutory rules of the road);

    g.  Failing to keep a proper lookout;

    h.  Failing to take proper remedial action which could have avoided the collision or minimized the impact;

    i.  Failing to reduce speed to avoid a collision;

    j.  Failing to keep the tractor-trailer under control at all times;

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

k.  Failing to exhibit the qualities of a professional driver;

l.  Driving while tired and/or fatigued;

m.  Driving while under the unsafe side-effects of prescription medication;

n.  Driving overly aggressively;

o.  Failing to utilize defensive driving tactics;

p.  Failing to maintain a safe following distance behind other motorists;

q.  Failing to maintain a speed that was safe given the weather and road conditions;

r.  Failing to warn other motorists of the impending collision so to allow them time to prepare/potentially avoid/brace for impact;

s.  Failing to stop his vehicle, slacken his speed, swerve or sound a warning in an attempt to avoid colliding with the other vehicle involved in this crash, when he could and should have done in so in the exercise of the highest degree of reasonable care; and

t.  Driving in a manner that allowed the steel coils to become dislodged from the flatbed trailer and land on the interstate.

56.  At least one of the negligent acts or omissions by Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

57.  As a direct and proximate result of the negligence of Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

58.  As a direct and proximate result of the negligence of Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, Plaintiff has experienced pain,

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

59.    As a direct and proximate result of the negligence of Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

60.    As a direct and proximate result of the negligence of Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

61.    As a direct and proximate result of the negligence of Defendant VanWinkle, by and through its actual agent/employee, Defendant Watson, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant J VanWinkle Trucking, LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

<u>**COUNT III**</u>
<u>**DIRECT NEGLIGENCE OF DEFENDANT J VANWINKLE TRUCKING, LLC**</u>

**COMES NOW** Plaintiff Nina Marshall, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant J VanWinkle Trucking, LLC and further states:

62.    At all times relevant herein, Defendant VanWinkle was operating as an interstate motor carrier pursuant to authority granted to it by the U.S. Department of Transportation.

63.    At all times relevant herein, Defendant VanWinkle has been, or should have been,

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

aware of the existence of the Federal Motor Carrier Safety Regulations.

64.    At all times relevant herein, as an interstate motor carrier, Defendant VanWinkle owed a duty to the general public, including Plaintiff, to follow and comply with the Federal Motor Carrier Safety Regulations.

65.    At all times relevant herein, the various safety regulations included within Parts 385, 390, 391, 392, 393, 395, and 396, of which Defendant VanWinkle had a duty to follow, include, but are not limited to:

   a.  Defendant VanWinkle had an independent duty to require observance by its drivers of any duty or prohibition imposed upon the drivers by the Federal Motor Carrier Safety Regulations.  49 C.F.R. §390.11;

   b.  Defendant VanWinkle had a duty to not require or permit a driver, including Defendant Watson, to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle.  49 C.F.R. §392.3;

   c.  Defendant VanWinkle had a duty to not allow or permit a driver, including Defendant Watson, to operate a commercial motor vehicle unless that person is qualified to drive a commercial motor vehicle.  49 C.F.R. §391.11;

   d.  Defendant VanWinkle had an independent duty not to aid, abet, encourage or require any of its employees to violate the safety regulations contained within Chapter 390.  490 C.F.R. §390.13;

   e.  Defendant VanWinkle had an independent duty to prohibit its employees from driving a commercial vehicle unless the employee had first completed and furnished to Defendant VanWinkle an application for employment that meets the requirements as set forth in 49 C.F.R. §391.21(b);

   f.  Defendant VanWinkle had an independent duty to make investigations and inquiries with respect to each driver it employs and to do so in the manner prescribed in 49 C.F.R. §391.23;

   g.  Defendant VanWinkle had an independent duty to obtain the motor vehicle record of every driver it employs, including Defendant Watson, at least once every twelve months in determine whether that driver continues to meet the minimum requirements for safe driving or is disqualified to drive a commercial motor vehicle.  49 C.F.R. §391.25;

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

h.  Defendant VanWinkle had an independent duty require each of its drivers, including Defendant Watson, to furnish it with a list of all violations of motor vehicle traffic laws and ordinances of which he has been convicted in the preceding 12 months.  49 C.F.R. §391.27;

i.  Defendant VanWinkle had an independent duty to prohibit its employees, including Defendant Watson, from driving until the driver had successfully completed a road test and been issued a certificate of driver's road test.  40. C.F.R. §391.31;

j.  Defendant VanWinkle had an independent duty to ensure that its drivers, including Defendant Watson, were physically qualified to operate a commercial motor vehicle and that its drivers had undergone the necessary examinations in the required timeframes as set forth within the Federal Motor Carrier Safety Regulations.  40 C.F.R. §391 – Subpart E;

k.  Defendant VanWinkle had an independent duty to inspect, repair, and maintain, all of the motor vehicles subject to its control, including the motor vehicle operated by Defendant Watson on the day of the aforementioned crash, and to ensure that the motor vehicle and all of its parts and accessories were in proper operating condition at all times, including at the time of the aforementioned crash. 40 C.F.R. §396.3; and

l.  Defendant VanWinkle had an independent duty to inspect, properly distribute, and secure the subject cargo.  40 C.F.R. §329.9.

66.    Defendant VanWinkle breached its above listed duties to the general public, including Plaintiff, by its failing to take those actions enumerated in the above paragraphs.

67.    Further, it is customarily standard in the motor carrier industry to have in place an adequate safety program administered by competent and adequately trained safety personnel to ensure that the motor carrier and its drivers are adhering to the Federal Motor Carrier Safety Regulations, including but not limited the specifically aforementioned regulations.

68.    That, at all times prior to the aforementioned collision, Defendant VanWinkle failed to have in place an adequate safety program.

69.    As a result of its inadequate and/or inexistent safety program, Defendant VanWinkle violated numerous Federal Motor Carrier Safety Regulations including, but not

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

limited to the specifically aforementioned regulations prior to the aforementioned collision involving Plaintiff.

70.     As a result of its inadequate and/or inexistent safety program, Defendant VanWinkle permitted its drivers, including Defendant Watson, to violate numerous Federal Motor Carrier Safety Regulations including, but not limited to the specifically aforementioned regulations prior to the aforementioned collision involving Plaintiff.

71.     That Defendant VanWinkle's violation of numerous Federal Motor Carrier Safety Regulations, including the specifically aforementioned regulations created a danger to the health, welfare, and safety of the motoring public, including Plaintiff.

72.     One or more of the negligent acts or omissions by Defendant VanWinkle, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

73.     As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff was permanently injured and sustained damages and will continue to be damaged in the manners previously described in this Petition.

74.     As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

75.     As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

76.     As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

77.     As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

78.     As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant J VanWinkle Trucking, LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment, and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

<u>**COUNT IV**</u>
<u>**DIRECT NEGLIGENCE AGAINST J VANWINKLE TRUCKING, LLC FOR**</u>
<u>**NEGLIGENT HIRING/RETENTION**</u>

**COMES NOW** Plaintiff Nina Marshall, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant J VanWinkle Trucking, LLC and further states:

79.     At all times prior to the aforementioned collision, Defendant VanWinkle owed a duty to the public, including Plaintiff, to diligently and adequately screen potential drivers and periodically screen hired drivers, including Defendant Watson, including but not limited to the extent mandated by the Federal Motor Carrier Safety Regulations.

80.     At all times prior to the aforementioned collision, Defendant VanWinkle owed a duty to the public, including Plaintiff, to discharge an incompetent or unsafe driver before he/she injured the public or property.

81.     Such specific duties relating to hiring and retention include, but are not limited to:

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

a.  Obtaining a completed employment application before permitting an agent, servant, and/or employee drive its commercial motor vehicle. 49 C.F.R. §391.21;

b.  Investigating the agents, servants, and/or employee's driver's employment record during the preceding three years by all reasonable means. 49 C.F.R. §§391.23(a)(2), 391.23(c);

c.  Inquiring into the agent's, servants, and/or employee's driving record within 30 days after employment begins. 49 C.F.R. §391.23(a);

d.  Requiring a successfully completed road test before commencing employment, and permitting the applicant, agent, servant, and/or employee to drive a commercial motor vehicle. 49 C.F.R. §391.31(a);

e.  Investigating the driver's safety performance history with Department of Transportation regulated employer during the preceding three years. 49 C.F.R. §391.23(2);

f.  Ensuring that its driver was qualified to properly secure cargo pursuant to 49 C.F.R. §390.5;

f.  Ensuring that its driver was qualified to operate the tractor-trailer (commercial motor vehicle) and had a valid and current DOT medical examiner's certificate. 49 C.F.R. §391.41; and

g.  Ensuring that its driver had no current diagnosis of high blood pressure, or other medical condition, likely to interfere with the ability to operate a commercial motor vehicle safely.  49 C.F.R. §391.41(b)(6).

82.    Defendant Watson was unqualified to properly secure the cargo and/or operate a commercial motor vehicle due to his driving history, inexperience, lack of skill, lack of training, lack of knowledge, and physical medical condition.

83.    That, because of Defendant Watson's aforementioned inadequacies, Defendant VanWinkle should not have hired or retained him to secure the cargo and/or operate a commercial motor vehicle.

84.    That by failing to properly and adequately screen and investigate its drivers, including Defendant Watson, before and during employment, Defendant VanWinkle violated numerous Federal Motor Carrier Safety Regulations, including but not limited to those

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

specifically identified in this count and breached its duties set forth above.

85.    Defendant VanWinkle knew or, had it obeyed the Federal Motor Carrier Safety Regulations, including but not limited to those specifically identified in this count, it would have learned of Defendant Watson's dangerous proclivities in that he was unqualified to safely secure the cargo and/or operate a commercial motor vehicle.

86.    Defendant Watson's negligent actions on the days leading up to the collision and on the day of the collision with Plaintiff was consistent with, related to, and a product of his aforementioned inadequacies in securing the cargo and/or operating a commercial motor vehicle.

87.    Defendant VanWinkle's negligent actions and omissions in hiring and retaining Defendant Watson, including its violations of the Federal Motor Carrier Safety Regulations, was the proximate cause of the injuries and damages sustained by Plaintiff.

88.    As a direct and proximate result of the independent negligence of Defendant VanWinkle, Plaintiff was permanently injured and sustained damages and will continue to be damaged in the manners previously described in this Petition.

89.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

90.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

91.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

92.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

93.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant J Van Winkle Trucking, LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

**COUNT V**
**DIRECT NEGLIGENCE AGAINST J VANWINKLE TRUCKING, LLC FOR NEGLIGENT TRAINING**

**COMES NOW** Plaintiff Nina Marshall, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant J VanWinkle Trucking, LLC and further states:

94.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to use ordinary care to protect against unreasonable risks of harm.

95.    Specifically, Defendant VanWinkle owed a duty to the general public, including Plaintiff, to properly train its drivers, including Defendant Watson, regarding how to properly secure cargo to the trailer.

96.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to properly train its drivers, including Defendant Watson, regarding the safety regulations set forth in the Federal Motor Carrier Safety Regulations.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

97.     Such specific duties regarding training include, but are not limited to:

    a.  To require and verify that its drivers pass a knowledge and skills test as prescribed by the Federal Motor Carrier Safety Regulations;

    b.  To train its drivers on the Federal Motor Carrier Safety Regulations pertaining to medical certification, medical examination procedures, general qualifications, responsibilities, and disqualifications; and

    c.  To ensure that its drivers have been properly trained and to show proof of that training with a training certificate.

98.     Defendant VanWinkle owed the general public, including Plaintiff, a duty to properly train its drivers, including Defendant Watson, regarding how to safely operate a commercial motor vehicle.

99.     Defendant VanWinkle owed the general public, including Plaintiff, a duty to diligently and adequately periodically screen drivers to the extent mandated by the Federal Motor Carrier Safety Regulations.

100.    Defendant VanWinkle owed a duty to the general public, including Plaintiff, a duty to provide ongoing safety courses to its drivers, including Defendant Watson.

101.    Defendant VanWinkle breached the aforesaid duties in that it failed to properly train Defendant Watson regarding the safety regulations, how to properly secure cargo to the tractor-trailer, how to safely operate a commercial motor vehicle, failed to screen its drivers, and/or failed to provide ongoing safety courses.

102.    Defendant Watson's aforementioned negligent actions and/or inactions were consistent with the fact that Defendant VanWinkle failed to properly train him on the safe securement of cargo and the safe operation of a commercial motor vehicle and/or the adherence to the Federal Motor Carrier Safety Regulations.

103.    At least one of the negligent acts or omissions by Defendant VanWinkle, as

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

104.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff was permanently injured and sustained damages and will continue to be damaged in the manners previously described in this Petition.

105.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

106.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

107.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

108.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

109.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant J VanWinkle Trucking, LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

## <u>COUNT VI</u>
### <u>DIRECT NEGLIGENCE AGAINST J VAN WINKLE TRUCKING, LLC BASED UPON</u>

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

## NEGLIGENT SUPERVISION

**COMES NOW** Plaintiff Nina Marshall, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant J VanWinkle Trucking, LLC and further states:

110.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to continuously evaluate and supervise its drivers' performance, including the performance of Defendant Watson.

111.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to not require or permit a driver, including Defendant Watson, to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to secure the cargo and/or operate the commercial motor vehicle.  49 C.F.R. §392.3.

112.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to inquire into the motor vehicle record of its drivers and give "great weight" to violations such as speeding or reckless driving.  49 C.F.R. §391.25.

113.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to ensure that its drivers were continuously physically qualified to safely operate the tractor-trailer. 49 C.F.R. §391.41, 391.43.

114.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to ensure its drivers were continuously qualified to safely secure cargo.  49 C.F.R. §390.5.

115.    Defendant VanWinkle owed the general public, including Plaintiff, a duty to maintain a driver qualification file for each driver it employs.  49 C.F.R. §391.51.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

116. Defendant VanWinkle owed the general public, including Plaintiff, a duty to maintain a driver investigation history file for each driver it employs. 49 C.F.R. §391.53.

117. Defendant VanWinkle owed the general public, including Plaintiff, a duty to not allow or permit its on-duty drivers to be possession of drugs as listed in 49 C.F.R. §392.4(a).

118. Defendant VanWinkle owed the general public, including Plaintiff, a duty to not schedule a run, nor permit, nor require the operation of any commercial motor vehicle between points in such a period of time as would necessitate the commercial vehicle being operated at speeds greater than those prescribed by law. 49 C.F.R. §392.6.

119. Defendant VanWinkle breached its above listed duties to the general public, including Plaintiff, by its failing do those things enumerated in the above paragraphs and failing to properly supervise Defendant Watson, Defendant VanWinkle's commercial motor vehicle driver, who was unqualified, incompetent and should have been discharged prior to this crash.

120. At least one of the negligent acts or omissions by Defendant VanWinkle, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

121. As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff was permanently injured and sustained damages and will continue to be damaged in the manners previously described in this Petition.

122. As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

123.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

124.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

125.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

126.    As a direct and proximate result of the negligence of Defendant VanWinkle, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant J Van Winkle Trucking, LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

## COUNT VII
## NEGLIGENCE AGAINST NUCOR CORPORATION d/b/a NUCOR STEEL

**COMES NOW** Plaintiff Nina Marshall, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant Nucor Corporation d/b/a Nucor Steel and further states:

127.    Defendant Nucor was a seller/shipper within the meaning of statutes and regulations pertinent to the Federal Motor Carrier Safety Regulations.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

128.     Defendant Nucor undertook the securement of the cargo (steel coils) and/or directed others regarding the securement of the cargo (steel coils) to the trailer involved in the incident at issue.

129.     In doing so, Defendant Nucor owed a duty to the general public, including Plaintiff, to safely secure the cargo to the trailer prior to transport and/or to properly and safely direct others regarding the securement of the cargo.

130.     Defendant Nucor breached the aforesaid duty in that it failed to safely secure the cargo pursuant to accepted safety standards and/or directed others to secure the cargo in an unsafe manner.

131.     Defendant Nucor owed a duty to the general public, including Plaintiff, to only hire safe, experienced, and qualified individuals/entities to secure and cargo and/or transport the cargo.

132.     Defendant Nucor hired and accepted Defendant PGT Trucking as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant PGT Trucking during the transaction relevant hereto.

133.     Defendant Nucor knew and/or should have known that Defendant PGT Trucking was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely secure the cargo to the trailer and/or transport the cargo and/or hire a safe End Carrier to transport the cargo without adequate instruction, guidance, attention, and/or oversight.

134.     Defendant Nucor hired and accepted Defendant Kinder Morgan as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant Kinder Morgan during the transaction relevant hereto.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

135.    Defendant Nucor knew and/or should have known that Defendant Kinder Morgan was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely unload and store the cargo and/or secure the cargo to the trailer without adequate instruction, guidance, attention, and/or oversight.

136.    Defendant Nucor breached the aforesaid duties in that it knew, or should have known, that Defendant PGT Trucking and/or Defendant Kinder Morgan were not safe, experienced, and qualified to secure the cargo and/or transport the cargo.

137.    The inexperienced, reckless, careless, incompetent, and/or otherwise unfit handling of the steel products that ultimately hurt Plaintiff in the course of the collision were a direct and proximate result of the negligent conduct of Defendant Nucor.

138.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

139.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff was required to expend and incur medical expenses.

140.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff will more likely than not require future medical care and will thus incur future medical expenses.

141.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff missed significant time from work and missed additional time for her reasonable and necessary medical care, resulting in lost wages.

142.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff's ability to work in the future is limited and her ability to earn wages is diminished by the injuries she suffered in this crash.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

143.    As a direct and proximate result of the negligence of Defendant Nucor, Plaintiff has suffered and will more likely than not continue to suffer into the future, pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life, all as a result of her injuries.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant Nucor Corporation d/b/a Nucor Steel in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

## COUNT VIII
## NEGLIGENCE AGAINST KINDER MORGAN BULK TERMINALS LLC

**COMES NOW** Plaintiff Nina Marshall, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant Kinder Morgan Bulk Terminals LLC and further states:

144.    Defendant Kinder Morgan received, unloaded, stored, secured to the trailer at issue, and/or directed others regarding the securement, the steel coils prior to transport from Arkansas to Missouri.

145.    In doing so, Defendant Kinder Morgan owed a duty to the general public, including Plaintiff, to safely receive, unload, store, and secure the cargo to the trailer, and/or direct others to safely secure the cargo.

146.    Defendant Kinder Morgan breached the aforesaid duty in that it failed to safely unload, store, secure, and/or direct others regarding the securement, the steel coils pursuant to accepted safety standards.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

147.    The inexperienced, reckless, careless, incompetent, and/or otherwise unfit handling of the steel products that ultimately hurt Plaintiff in the course of the collision were a direct and proximate result of the negligent conduct of Defendant Kinder Morgan.

148.    As a direct and proximate result of the negligence of Defendant Kinder Morgan, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

149.    As a direct and proximate result of the negligence of Defendant Kinder Morgan, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

150.    As a direct and proximate result of the negligence of Defendant Kinder Morgan, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

151.    As a direct and proximate result of the negligence of Defendant Kinder Morgan, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

152.    As a direct and proximate result of the negligence of Defendant Kinder Morgan, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant Kinder Morgan Bulk Terminals LLC in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

## COUNT IX
## VICARIOUS LIABILITY AGAINST PGT TRUCKING, INC.

**COMES NOW** Plaintiff Nina Marshall, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

as if they were set forth herein at length against Defendant PGT Trucking, Inc., and further states:

153.    At all times relevant herein, Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, was required to obey the Federal Motor Carrier Safety Regulations and safe trucking industry standards while operating a commercial motor vehicle.

154.    At all times relevant herein, Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, was required to obey Missouri's statutory Rules of the Road while operating a commercial motor vehicle.  RSMo. 304.014.

155.    At all times relevant herein, Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, owed a duty to the public, including Plaintiff, to exercise the highest degree of care while securing the cargo to the tractor-trailer and operating the tractor-trailer on the interstate.

156.    Defendant PGT Trucking, through its apparent agent/employee, Defendant Watson, breached this duty of care when, on June 1, 2021, it acted in a negligent, careless, and reckless manner, to wit:

    a.  Failing to inspect, properly distribute, and secure the subject cargo, the steel coils, pursuant to 49 C.F.R. Section 329.9) prior to operating the tractor-trailer;

    b.  Undertaking the securement of the subject cargo, the steel coils, without the adequate training, experience, and/or qualifications to do so;

    c.  Operating the tractor-trailer, with the steel coils, without the adequate training, experience, and/or qualifications to do so;

    d.  Failing to operate the tractor-trailer in a careful and prudent manner;

    e.  Driving too fast for conditions in violation of RSMo, Chapter 304, (commonly referred to as Missouri's statutory rules of the road);

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

f.  Failing to reduce speed to avoid a collision in violation of RSMo. Chapter 304 (commonly referred to as Missouri's statutory rules of the road);

g.  Failing to keep a proper lookout;

h.  Failing to take proper remedial action which could have avoided the collision or minimized the impact;

i.  Failing to reduce speed to avoid a collision;

j.  Failing to keep the tractor-trailer under control at all times;

k.  Failing to exhibit the qualities of a professional driver;

l.  Driving while tired and/or fatigued;

m.  Driving while under the unsafe side-effects of prescription medication;

n.  Driving overly aggressively;

o.  Failing to utilize defensive driving tactics;

p.  Failing to maintain a safe following distance behind other motorists;

q.  Failing to maintain a speed that was safe given the weather and road conditions;

r.  Failing to warn other motorists of the impending collision so to allow them time to prepare/potentially avoid/brace for impact;

s.  Failing to stop his vehicle, slacken his speed, swerve or sound a warning in an attempt to avoid colliding with the other vehicle involved in this crash, when he could and should have done in so in the exercise of the highest degree of reasonable care; and

t.  Driving in a manner that allowed the steel coils to become dislodged from the flatbed trailer and land on the interstate.

157.    At least one of the negligent acts or omissions by Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

158.    As a direct and proximate result of the negligence of Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

159.    As a direct and proximate result of the negligence of Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

160.    As a direct and proximate result of the negligence of Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

161.    As a direct and proximate result of the negligence of Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

162.    As a direct and proximate result of the negligence of Defendant PGT Trucking, by and through its apparent agent/employee, Defendant Watson, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant PGT Trucking, Inc., in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

## COUNT X
## DIRECT NEGLIGENCE OF DEFENDANT PGT TRUCKING, INC.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

**COMES NOW** Plaintiff Nina Marshall, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant PGT Trucking, Inc. and further states:

163.    At all times relevant herein, Defendant PGT Trucking was operating as an interstate motor carrier pursuant to authority granted to it by the U.S. Department of Transportation.

164.    At all times relevant herein, Defendant PGT Trucking has been, or should have been, aware of the existence of the Federal Motor Carrier Safety Regulations.

165.    At all times relevant herein, as an interstate motor carrier, Defendant PGT Trucking owed a duty to the general public, including Plaintiff, to follow and comply with the Federal Motor Carrier Safety Regulations.

166.    At all times relevant herein, the various safety regulations included within Parts 385, 390, 391, 392, 393, 395, and 396, of which Defendant PGT Trucking had a duty to follow, include, but are not limited to:

    a.    Defendant PGT Trucking had an independent duty to require observance by its drivers of any duty or prohibition imposed upon the drivers by the Federal Motor Carrier Safety Regulations.  49 C.F.R. §390.11;

    b.    Defendant PGT Trucking had a duty to not require or permit a driver, including Defendant Watson, to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle.  49 C.F.R. §392.3;

    c.    Defendant PGT Trucking had a duty to not allow or permit a driver, including Defendant Watson, to operate a commercial motor vehicle unless that person is qualified to drive a commercial motor vehicle.  49 C.F.R. §391.11;

    d.    Defendant PGT Trucking had an independent duty not to aid, abet, encourage or require any of its employees to violate the safety regulations contained within Chapter 390.  490 C.F.R. §390.13;

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

e.  Defendant PGT Trucking had an independent duty to prohibit its employees from driving a commercial vehicle unless the employee had first completed and furnished to Defendant PGT Trucking an application for employment that meets the requirements as set forth in 49 C.F.R. §391.21(b);

f.  Defendant PGT Trucking had an independent duty to make investigations and inquiries with respect to each driver it employs and to do so in the manner prescribed in 49 C.F.R. §391.23;

g.  Defendant PGT Trucking had an independent duty to obtain the motor vehicle record of every driver it employs, including Defendant Watson, at least once every twelve months in determine whether that driver continues to meet the minimum requirements for safe driving or is disqualified to drive a commercial motor vehicle.  49 C.F.R. §391.25;

h.  Defendant PGT Trucking had an independent duty require each of its drivers, including Defendant Watson, to furnish it with a list of all violations of motor vehicle traffic laws and ordinances of which he has been convicted in the preceding 12 months.  49 C.F.R. §391.27;

i.  Defendant PGT Trucking had an independent duty to prohibit its employees, including Defendant Watson, from driving until the driver had successfully completed a road test and been issued a certificate of driver's road test.  40. C.F.R. §391.31;

j.  Defendant PGT Trucking had an independent duty to ensure that its drivers, including Defendant Watson, were physically qualified to operate a commercial motor vehicle and that its drivers had undergone the necessary examinations in the required timeframes as set forth within the Federal Motor Carrier Safety Regulations.  40 C.F.R. §391 – Subpart E;

k.  Defendant PGT Trucking had an independent duty to inspect, repair, and maintain, all of the motor vehicles subject to its control, including the motor vehicle operated by Defendant Watson on the day of the aforementioned crash, and to ensure that the motor vehicle and all of its parts and accessories were in proper operating condition at all times, including at the time of the aforementioned crash.  40 C.F.R. §396.3; and

l.  Defendant PGT Trucking had an independent duty to inspect, properly distribute, and secure the subject cargo.  40 C.F.R. §329.9.

167.    Defendant PGT Trucking breached its above listed duties to the general public, including Plaintiff, by its failing do those things enumerated in the above paragraphs and

168.    Further, it is customarily standard in the motor carrier industry to have in place an

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

adequate safety program administered by competent and adequately trained safety personnel to ensure that the motor carrier and its drivers are adhering to the Federal Motor Carrier Safety Regulations, including but not limited the specifically aforementioned regulations.

169.    That, at all times prior to the aforementioned collision, Defendant PGT Trucking failed to have in place an adequate safety program.

170.    As a result of its inadequate and/or inexistent safety program, Defendant PGT Trucking violated numerous Federal Motor Carrier Safety Regulations including, but not limited to the specifically aforementioned regulations prior to the aforementioned collision involving Plaintiff.

171.    As a result of its inadequate and/or inexistent safety program, Defendant PGT Trucking allowed its drivers, including Defendant Watson, to violate numerous Federal Motor Carrier Safety Regulations including, but not limited to the specifically aforementioned regulations prior to the aforementioned collision involving Plaintiff.

172.    That Defendant PGT Trucking's violation of numerous Federal Motor Carrier Safety Regulations, including the specifically aforementioned regulations created a danger to the health, welfare, and safety of the motoring public, including Plaintiff.

173.    At least one of the negligent acts or omissions by Defendant PGT Trucking, as described herein, was a direct and proximate cause of the crash in question, the impact of the steel coils with Plaintiff's vehicle, and the resulting severe and permanent injuries to Plaintiff.

174.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff was permanently injured and sustained damages and will continue to be damaged in the manners previously described in this Petition.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

175.   As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

176.   As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff has experienced pain, suffering, emotional distress, post-traumatic stress disorder, the loss of enjoyment of life, and will likely continue to experience such in the future.

177.   As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff has incurred medical expenses related to the treatment of injuries sustained in the crash.

178.   As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff more likely than not will need future medical treatment and incur future medical expenses.

179.   As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff is reasonably likely to suffer future loss wages and future loss of earning capacity.

180.   Defendant PGT Trucking knew or had information from which it, in the exercise of ordinary care, could have known that such conduct as described herein created a high degree of probability of injury to the motoring public such as Plaintiff.

181.   The conduct of Defendant PGT Trucking, as described herein, specifically including violations of Missouri state law and the various Federal Motor Carrier Safety Regulations, was willful, wanton, and reckless, and shows complete indifference and conscious disregard for the safety of the motoring public.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant PGT Trucking, Inc. in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment, and post-judgment interests, punitive damages, and for such other relief this Court

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

deems just and proper under the circumstances.

## COUNT XI
## DIRECT NEGLIGENCE AGAINST PGT TRUCKING, INC.

**COMES NOW** Plaintiff Nina Marshall, by and through her attorneys of record, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant PGT Trucking, Inc. and further states:

182.    Defendant PGT Trucking was a carrier within the meaning of statutes and regulations pertinent to the Federal Motor Carrier Safety Regulations.

183.    Defendant PGT Trucking undertook the securement of the cargo (steel coils) and/or directed others regarding the securement of the cargo (steel coils) to the trailer involved in the incident at issue.

184.    In doing so, Defendant PGT Trucking owed a duty to the general public, including Plaintiff, to safely secure the cargo to the trailer prior to transport and/or to properly and safely direct others regarding the securement of the cargo.

185.    Defendant PGT Trucking breached the aforesaid duty in that it failed to safely secure the cargo pursuant to accepted safety standards and/or directed others to secure the cargo in an unsafe manner.

186.    Defendant PGT Trucking owed a duty to the general public, including Plaintiff, to only hire safe, experienced, and qualified individuals/entities to secure and cargo and/or transport the cargo.

187.    Defendant PGT Trucking hired and accepted Defendant VanWinkle as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant VanWinkle during the transaction relevant hereto.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

188.    Defendant PGT Trucking knew and/or should have known that Defendant VanWinkle was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely secure the cargo to the trailer and/or transport the cargo without adequate instruction, guidance, attention, and/or oversight.

189.    Defendant PGT Trucking hired and accepted Defendant Kinder Morgan as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant Kinder Morgan during the transaction relevant hereto.

190.    Defendant PGT Trucking knew and/or should have known that Defendant Kinder Morgan was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely unload and store the cargo and/or secure the cargo to the trailer without adequate instruction, guidance, attention, and/or oversight.

191.    Defendant PGT Trucking breached the aforesaid duties in that it knew, or should have known, that Defendant VanWinkle and/or Defendant Kinder Morgan were not safe, experienced, and qualified to secure the cargo and/or transport the cargo.

192.    The inexperienced, reckless, careless, incompetent, and/or otherwise unfit handling of the steel products that ultimately hurt Plaintiff in the course of the collision were a direct and proximate result of the negligent conduct of Defendant PGT Trucking.

193.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

194.    As a direct and proximate result of the negligence of Defendant PGT Trucking Plaintiff was required to expend and incur medical expenses.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

195.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff will more likely than not require future medical care and will thus incur future medical expenses.

196.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff missed significant time from work and missed additional time for her reasonable and necessary medical care, resulting in lost wages.

197.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff's ability to work in the future is limited and her ability to earn wages is diminished by the injuries she suffered in this crash.

198.    As a direct and proximate result of the negligence of Defendant PGT Trucking, Plaintiff has suffered and will more likely than not continue to suffer into the future, pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life, all as a result of her injuries.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant PGT Trucking, Inc. in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

<u>**COUNT XII**</u>
<u>**NEGLIGENCE AGAINST HEIDTMAN STEEL PRODUCTS, INC.**</u>

**COMES NOW** Plaintiff Nina Marshall, by and through her attorney, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant Heidtman Steel Products, Inc. and further states:

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

199.    Defendant Heidtman Steel undertook the securement of the cargo (steel coils) and/or directed others regarding the securement of the cargo (steel coils) to the trailer involved in the incident at issue.

200.    In doing so, Defendant Heidtman Steel owed a duty to the general public, including Plaintiff, to safely secure the cargo to the trailer prior to transport and/or to properly and safely direct others regarding the securement of the cargo.

201.    Defendant Heidtman Steel breached the aforesaid duty in that it failed to safely secure the cargo pursuant to accepted safety standards and/or directed others to secure the cargo in an unsafe manner.

202.    Defendant Heidtman Steel owed a duty to the general public, including Plaintiff, to only hire safe, experienced, and qualified individuals/entities to secure and cargo and/or transport the cargo.

203.    Defendant Heidtman Steel hired and accepted Defendant PGT Trucking as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant PGT Trucking during the transaction relevant hereto.

204.    Defendant Heidtman Steel knew and/or should have known that Defendant PGT Trucking was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely secure the cargo to the trailer and/or transport the cargo without adequate instruction, guidance, attention, and/or oversight.

205.    Defendant Heidtman Steel hired and accepted Defendant Kinder Morgan as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant Kinder Morgan during the transaction relevant hereto.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

206.    Defendant Heidtman Steel knew and/or should have known that Defendant Kinder Morgan was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely unload and store the cargo and/or secure the cargo to the trailer without adequate instruction, guidance, attention, and/or oversight.

207.    Defendant Heidtman Steel breached the aforesaid duties in that it knew, or should have known, that Defendant PGT Trucking and/or Defendant Kinder Morgan were not safe, experienced, and qualified to secure the cargo and/or transport the cargo.

208.    The inexperienced, reckless, careless, incompetent, and/or otherwise unfit handling of the steel products that ultimately hurt Plaintiff in the course of the collision were a direct and proximate result of the negligent conduct of Defendant Heidtman Steel.

209.    As a direct and proximate result of the negligence of Defendant Heidtman Steel, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

210.    As a direct and proximate result of the negligence of Defendant Heidtman Steel Plaintiff was required to expend and incur medical expenses.

211.    As a direct and proximate result of the negligence of Defendant Heidtman Steel, Plaintiff will more likely than not require future medical care and will thus incur future medical expenses.

212.    As a direct and proximate result of the negligence of Defendant Heidtman Steel, Plaintiff missed significant time from work and missed additional time for her reasonable and necessary medical care, resulting in lost wages.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

213.    As a direct and proximate result of the negligence of Defendant Heidtman Steel, Plaintiff's ability to work in the future is limited and her ability to earn wages is diminished by the injuries she suffered in this crash.

214.    As a direct and proximate result of the negligence of Defendant Heidtman Steel, Plaintiff has suffered and will more likely than not continue to suffer into the future, pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life, all as a result of her injuries.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant Heidtman Steel Products, Inc. in a sum in excess of Twenty-Five Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

<u>**COUNT XIII**</u>
<u>**NEGLIGENCE AGAINST STANLEY BLACK & DECKER CORPORATION**</u>
<u>**f/k/a WATERLOO INDUSTRIES**</u>

**COMES NOW** Plaintiff Nina Marshall, by and through her attorney, and repeats, incorporates, and re-alleges each and every paragraph and sub-paragraph set forth above as if they were set forth herein at length against Defendant Stanley Black & Decker Corporation f/k/a Waterloo Industries and further states:

215.    Defendant Black & Decker undertook the securement of the cargo (steel coils) and/or directed others regarding the securement of the cargo (steel coils) to the trailer involved in the incident at issue.

216.    In doing so, Defendant Black & Decker owed a duty to the general public, including Plaintiff, to safely secure the cargo to the trailer prior to transport and/or to properly and safely direct others regarding the securement of the cargo.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

217.    Defendant Black & Decker breached the aforesaid duty in that it failed to safely secure the cargo pursuant to accepted safety standards and/or directed others to secure the cargo in an unsafe manner.

218.    Defendant Black & Decker owed a duty to the general public, including Plaintiff, to only hire safe, experienced, and qualified individuals/entities to secure and cargo and/or transport the cargo.

219.    Defendant Black & Decker hired and accepted Defendant PGT Trucking as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant PGT Trucking during the transaction relevant hereto.

220.    Defendant Black & Decker knew and/or should have known that Defendant PGT Trucking was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely secure the cargo to the trailer and/or transport the cargo without adequate instruction, guidance, attention, and/or oversight.

221.    Defendant Black & Decker hired and accepted Defendant Kinder Morgan as its agent in the transaction as aforesaid and/or retained sufficient control over Defendant Kinder Morgan during the transaction relevant hereto.

222.    Defendant Black & Decker knew and/or should have known that Defendant Kinder Morgan was too inexperienced, reckless, careless, incompetent, and/or otherwise unfit to safely unload and store the cargo and/or secure the cargo to the trailer without adequate instruction, guidance, attention, and/or oversight.

223.    Defendant Black & Decker breached the aforesaid duties in that it knew, or should have known, that Defendant PGT Trucking and/or Defendant Kinder Morgan were not safe, experienced, and qualified to secure the cargo and/or transport the cargo.

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

224.    The inexperienced, reckless, careless, incompetent, and/or otherwise unfit handling of the steel products that ultimately hurt Plaintiff in the course of the collision were a direct and proximate result of the negligent conduct of Defendant Black & Decker.

225.    As a direct and proximate result of the negligence of Defendant Black & Decker, Plaintiff suffered injury to her left arm, left knee, lumbar spine, left elbow, left hip, left shoulder, right ankle, neck, and head and said injuries are painful, permanent and progressive.

226.    As a direct and proximate result of the negligence of Defendant Black & Decker Plaintiff was required to expend and incur medical expenses.

227.    As a direct and proximate result of the negligence of Defendant Black & Decker, Plaintiff will more likely than not require future medical care and will thus incur future medical expenses.

228.    As a direct and proximate result of the negligence of Defendant Black & Decker, Plaintiff missed significant time from work and missed additional time for her reasonable and necessary medical care, resulting in lost wages.

229.    As a direct and proximate result of the negligence of Defendant Black & Decker, Plaintiff's ability to work in the future is limited and her ability to earn wages is diminished by the injuries she suffered in this crash.

230.    As a direct and proximate result of the negligence of Defendant Black & Decker, Plaintiff has suffered and will more likely than not continue to suffer into the future, pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life, all as a result of her injuries.

**WHEREFORE** Plaintiff Nina Marshall prays for judgment against Defendant Stanley Black & Decker Corporation f/k/a Waterloo Industries a sum in excess of Twenty-Five

Electronically Filed - CAPE GIRARDEAU (JACKSON) - September 12, 2023 - 10:21 AM

Thousand Dollars ($25,000.00), taxable costs, prejudgment and post-judgment interests, and for such other relief this Court deems just and proper under the circumstances.

Respectfully submitted,

**COOK, BARKETT, PONDER, & WOLZ, L.C.**

By:     /s/:Daniel J. Grimm
        Daniel J. Grimm #59209
        1610 N. Kingshighway, Suite 201
        Cape Girardeau, Missouri 63701
        Telephone: (573) 335-6651
        Facsimile: (573) 200-8401
        Email: dgrimm@cbpw-law.com
        **ATTORNEY FOR PLAINTIFF**

**THE SUMNER LAW GROUP, LLC**

By:     /s/ K. Lindsay Rakers
        Brent A. Sumner, # 59460
        Andrew Martin, #62657
        K. Lindsay Rakers, #51754
        7777 Bonhomme Ave, Ste. 2100
        Clayton, MO 63105
        Telephone: (314) 669-0048
        Facsimile: (888) 259-7550
        brent@sumnerlawgroup.com
        andrew@sumnerlawgroup.com
        lindsay@sumnerlawgroup.com
        **CO-COUNSEL FOR PLAINTIFF**